IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LINDA HAUCK as personal representative
of the Estate of Deborah A. Chambers,

     Plaintiff,

vs.                                   Civ. No. 18-471 KG/LF

WABASH NATIONAL CORPORATION,

     Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

     This matter comes before the Court upon Defendant's Motion to Dismiss for Spoliation and Supporting Brief (Motion to Dismiss), filed October 23, 2018. (Doc. 34). Plaintiff filed a response on January 9, 2019, and Defendant filed a reply on January 23, 2019. (Docs. 71 and 74). On June 13, 2019, Plaintiff filed a surreply. (Doc. 106).

     Defendant requests that the Court hold a hearing on the Motion to Dismiss. The Court, however, has sufficient documentary evidence to decide the Motion to Dismiss without a hearing. The Court, therefore, denies Defendant's request for a hearing. Having considered the Motion to Dismiss and the accompanying briefing, the Court also denies the Motion to Dismiss.

*I. Background*

     *A. The Complaint*

     On September 6, 2016, Deborah Chambers was driving a PT Cruiser that collided with a semi-trailer, under-riding the side of the semi-trailer. (Doc. 1-1) at ¶¶ 19 and 22. Chambers died as a result of the collision. *Id.* at ¶ 23. Plaintiff "originally pursued claims of negligence against

the truck driver and the trucking company involved in the collision (Spurlin Trucking)."[1]  (Doc. 71) at 1.  Plaintiff's prior counsel settled those claims "outside the context of a lawsuit."  *Id.*

On April 6, 2018, Plaintiff filed her Complaint alleging that Defendant manufactured the semi-trailer involved in the collision (the subject semi-trailer) and identifying the subject semi-trailer as a 2000 Wabash DVCV semi-trailer, VIN 1JJV532W1YL629228.  (Doc. 1-1) at ¶ 20. Plaintiff alleged that the subject semi-trailer failed to have "any shield, guard or other device to prevent vehicles … from under-riding the side of the" semi-trailer.  *Id.* at ¶ 21.  Consequently, Plaintiff brought strict liability and negligence claims against Defendant for the defective and unreasonably dangerous condition of the subject semi-trailer.  *Id.* at ¶¶ 24-31.

The Court subsequently dismissed Plaintiff's claims based on a 2000 Wabash DVCV semi-trailer, VIN1JJV532W1YL629228, but allowed Plaintiff to amend her Complaint to allege that a 2004 Wabash semi-trailer with a partial VIN of 876286 was the subject semi-trailer. (Docs. 117-19, 121).

B.  *Facts Relevant to this Motion to Dismiss*

1.  *The Spoliation*

Following the collision, J & M Towing towed the PT Cruiser to Moriarty, New Mexico, where the PT Cruiser was later transferred to Insurance Auto Auctions. (IAA).  (Doc. 34-1) at 5. IAA then sold the PT Cruiser to an auto parts company in El Paso, Texas, where is was apparently demolished.  *Id.* at 5-6.  Plaintiff has no knowledge of the PT Cruiser's current whereabouts.  *Id.* at 6.

On October 6, 2016, a month after the collision, Plaintiff's attorney wrote a letter to Spurlin Trucking requesting Spurlin Trucking to preserve the tractor and subject semi-trailer

---

[1] "[I]t appears that Spurlin Trucking is no longer in business…."  (Doc. 74) at 8.

because they would "be evidence in the Estate's wrongful death claim" and Plaintiff's expert needed to inspect the tractor and subject semi-trailer. (Doc. 71-1) at 2.

At some point after the collision, McKinney Vehicle Services d/b/a McKinney Trailer Rentals (McKinney) took possession of the subject semi-trailer and leased it to Elite Freight Systems, Inc. (Elite). (Doc. 34-1) at 6. Elite, however, has not returned the subject semi-trailer to McKinney. *Id.* Plaintiff has no knowledge of the current whereabouts of the subject semi-trailer. *Id.*

Although the PT Cruiser and subject semi-trailer are unavailable, there are 35 photographs of the accident scene taken by a sheriff's deputy, 3-D scans of the PT Cruiser produced by Plaintiff's accident reconstructionist, and 149 photographs of the PT Cruiser taken by Plaintiff's accident reconstructionist following the accident. (Docs. 71-3, 71-4, and 71-5). Defendant maintains that Plaintiff's accident reconstructionist also "had the opportunity to inspect the trailer, although he apparently decided not to do so." (Doc. 74) at 8.

### 2. *Andrew Irwin's Affidavit*

Defendant retained an accident reconstructionist, Andrew Irwin, to reconstruct the accident. According to Plaintiff, Irwin has not yet "undertaken the reconstruction of the accident." (Doc. 71) at 3. Nonetheless, Irwin provided an affidavit in support of this Motion to Dismiss and Plaintiff deposed Irwin.

Irwin attests in his affidavit that reconstruction of the accident includes "determining the speed and angle at which Ms. Chambers' vehicle contacted the subject trailer." (Doc. 34-2) at 2, ¶ 3. To calculate the speed of the PT Cruiser when it struck the subject semi-trailer, Irwin must determine the "total amount of energy involved in the collision." *Id.* at 3, ¶ 7. To make that energy determination, Irwin typically "inspect[s] the trailer to determine what portions of it were

deformed as a result of the collision." *Id.* at ¶ 4. In addition, Irwin typically "inspect[s] the car to determine which part of it initially contacted the trailer, and to make [his] own measurements of the extent to which the vehicle was deformed as a result of the collision." *Id.* at ¶ 5.

In this case, Plaintiff's accident reconstructionist provided Irwin with "crush data" from the PT Cruiser, "which is informative with regard to the amount of energy absorbed by the car during the collision." *Id.* at ¶ 6. Irwin, however, has not seen any "information that would be informative with regard to the amount of energy absorbed by the trailer…." *Id.*

Irwin would also calculate the PT Cruiser's "crash pulse," "the amount of time between the initial contact and the point at which Ms. Chambers' car was brought to a stop." *Id.* at ¶ 8. Irwin states that "[t]he crash pulse is important in understanding the forces exerted on Ms. Chambers' body, which is important in determining the cause of injuries in cases such as this." *Id.* at 3-4, ¶ 8. Irwin, however, notes that "[w]ithout knowing the speed of Ms. Chambers' car, a crash pulse cannot be calculated with precision." *Id.* at 3, ¶ 8.

Although Irwin has photographic evidence from which to determine the angle of impact, "[a] physical inspection of the trailer would have provided more accurate information regarding the location of the initial contact, how far Ms. Chambers' car moved along the side of the trailer, and the amount of deformation of the trailer along the path of impact." *Id.* at 4, ¶ 9.

Irwin notes that the data Plaintiff's accident reconstructionist downloaded from the computer of the PT Cruiser, i.e., the black box, did not record any events, which "is unusual." *Id.* at ¶ 10. Irwin further notes that generally, "the inability to examine the car and the trailer places [him] at a great disadvantage by requiring [him] to rely on data from one party, and not an independent source." *Id.* at ¶ 11.

### 3. Andrew Irwin's Deposition Testimony

Irwin testified at his deposition that he received the sheriff's deputy's photographs of the accident scene and a copy of the sheriff's accident report. (Doc. 71-2) at 3. Irwin also received the sheriff's deputy's body cam footage, including audio recordings, taken at the scene of the accident. *Id.* at 4. In addition, Irwin received the 3-D scans of the PT Cruiser created by Plaintiff's accident reconstructionist, video files based on the scans, and "the raw data that is created as a process of creating that 3-D scan." *Id.* at 4-6. The scanned data did not include a scan of the undercarriage of the PT Cruiser. *Id.* at 5. Plaintiff further produced to Defendant the 149 photographs of the PT Cruiser taken by Plaintiff's accident reconstructionist, although Irwin testified he did not believe he had those photographs. *Id.* at 6.

#### a. Damage to the Undercarriage of the PT Cruiser

Irwin testified that, except for the undercarriage of the PT Cruiser, he could observe the crush damage to the PT Cruiser by examining the 3-D scans. *Id.* at 7. Irwin would expect damage to the undercarriage of the PT Cruiser considering the amount of "underride of the vehicle" and would have preferred to look at the undercarriage to quantify that damage. *Id.* at 7-8. Irwin explained that any energy absorbed by damage to the undercarriage "would add to the amount of energy brought into the crash by the PT Cruiser which would mean mathematically that the car's going faster as opposed to slower at impact." *Id.* at 8. Without an opportunity to examine the PT Cruiser, Irwin could not "put a number on how many foot-pounds of energy might have gone into" the undercarriage components. *Id.* at 9. Irwin, however, acknowledged that, even without information on the damage to the undercarriage of the PT Cruiser, the wreck could be reconstructed but he would "definitely [be] shorthanded in terms of not being able to see it and quantify it" and in defending his speed estimate on cross-examination. *Id.* at 9.

Irwin also noted that he could use EDCRASH software to reconstruct the accident but it may not capture evidence of additional energy absorbed through the movement of the PT Cruiser's power train. (Doc. 74-7) at 5, depo. at 32. To determine if the PT Cruiser's power train moved, Irwin would look underneath the PT Cruiser. *Id.* Irwin would also want to check under the PT Cruiser to determine if engine and transmission mounts became deformed, or rear axle assemblies shifted due to the absorption of energy at the time of the accident. *Id.* at 5, depo. at 33. Irwin further testified that, other than the undercarriage and suspension of the PT Cruiser, the 3-D scans and photographs would allow him to identify and evaluate damage to the entire PT Cruiser. (Doc. 71-2) at 10.

### b. Damage to the Front of the PT Cruiser

Even so, Irwin admitted that he could not ascertain from the 3-D scans the precise extent of the damage to the front structures of the PT Cruiser. Id. at 10. In other words, he could see damage to the surface of the front of the PT Cruiser but the superficial damage could be "masking some structural damage behind that…" *Id.* Irwin indicated that he could use EDCRASH to "quantify the amount of energy absorbed by the crush on the front of the vehicle and also to quantify the force that was involved in creating that crush profile." *Id.* at 15. Those measurements aid in determining a "closing speed." *Id.* Irwin also testified that depending on the quality of the 149 photographs of the PT Cruiser, he might be able to determine "all of the energy in the front structures of the car…" *Id.* at 16. If the quality of the photographs is not good, Irwin would want to inspect the vehicle. *Id.*

### c. Damage to the Greenhouse Structure of the PT Cruiser: the Trejo Method

In addition to determining energy absorption by the PT Cruiser's undercarriage and front, Irwin would calculate the extent of the deformation of the pillars inside the PT Cruiser to

see if the greenhouse structure of the PT Cruiser transmitted energy.  *Id.* at 6, depo. at 34.  Irwin

testified that one accepted method for determining the energies involved or absorbed by the PT

Cruiser's greenhouse structure is based on an SAE 2003 paper, "A Scientific Approach to

Tractor-Trailer Side Underride Analysis," written by Angela Trego and others.  (Doc. 71-2) at

17; (Doc. 71-6).  With the materials Irwin has, Irwin testified that he could use the Trego method

to estimate the energies involved or absorbed by the greenhouse structure of the PT Cruiser.

(Doc. 71-2) at 18-19.   Nonetheless, Irwin noted that because the Trego method relied on older

vehicles with weaker roofs and "[t]o the extent that there's other damage to either the PT Cruiser

or the trailer, it will most definitely underestimate the speed."  *Id.* at 25.

When asked about applying the Trego method in this case, Irwin testified that he believed

he had enough information to determine the angle of the impact, a factor in the Trego method.

*Id.* at 27-28.  Irwin believed he could also determine the crush pattern and crush area of the PT

Cruiser's roof and the deformation of the vehicle pillars to the extent he can see them in the

scanned data and photographs, other Trego method factors.  *Id.* at 28.

To analyze the trailer interaction factors in the Trego method, Irwin testified he believed

he could determine whether the PT Cruiser struck the subject semi-trailer's dollies and whether

the spare tire on the subject semi-trailer was involved in the crash.  *Id.* at 29-30.  Irwin testified

that although he is not sure that he could determine whether the PT Cruiser struck a spare tire

hanger, he could probably approximate "how many foot-pounds of energy it took to create some

hypothetical amount of hanger deformation."  *Id.* at 30.  He believed that such an approximation

would satisfy Daubert.  *Id.* at 31.  Based on the accident scene photographs, Irwin ruled out the

involvement of any type of toolbox along the trailer.  *Id.* at 31.  Irwin further testified that

quantifying the interaction between the PT Cruiser and the subject semi-trailer would be "pretty

tough to do" without the subject semi-trailer to inspect. *Id.* at 32. However, Irwin could obtain from Defendant other information like the spacing between the floor joists of the semi-trailer and the floor joists material, from which he could "generally" determine the type of forces necessary to deform the floor joists. *Id.* at 33. Without seeing the subject semi-trailer, Irwin could not determine "[e]xactly how much force it might take to create a particular amount of deformation" to the floor joists. *Id.*

### d. Other Reconstruction Methods

#### (1) SIMON Computer Simulation

In addition to the Trego method, Irwin explained that he would compare accident scene photographs, post-accident photographs, and the 3-D scans with various SIMON computer simulations using different speeds of the vehicles. *Id.* at 21. Irwin testified that he believed the SIMON simulation "would provide a fair and reasonable reconstruction of this crash[.]" *Id.* Irwin, however, was concerned that because he did not see the PT Cruiser, he would "potentially [be] handicap[ped] when it comes to cross-examination…." *Id.* Irwin noted that without measurements of the damage to the undercarriage of the PT Cruiser the SIMON analysis would be hypothetical. (Doc. 74-7) at 7, depo. at 41. "[O]therwise, SIMON is a method with the right amount of information that I think could be employed in this case to provide a reliable result." (Doc. 71-2) at 21-22. In other words, Irwin thought the SIMON simulation "would be scientifically reliable and fulfill the strictures of Daubert or any other type of evidentiary rules." *Id.* at 22.

#### (2) Movement of Center of Gravity

Irwin further testified that he could employ a movement of center of gravity analysis to reconstruct the accident. To use that method, an accident reconstructionist examines the

accident scene photographs to map out the physical evidence to "figure out how the two vehicles moved during the crash sequence or during the times relevant to the crash sequence…." *Id.* at 23. From that information, Irwin would measure the movement of the center of gravity and the PT Cruiser. *Id.* Irwin testified that he thought he could utilize that method with the information he had to reconstruct the accident. *Id.* Irwin further stated that a movement of the center of gravity analysis "would be scientifically reliable and provide a fair and accurate reconstruction of this crash[.]" *Id.* Moreover, Irwin testified that although a black box from the PT Cruiser would have been helpful to an accident reconstructionist, he can still reach scientifically reliable opinions without one. *Id.* at 44.

### e. Calculating Force of the Subject Semi-Trailer

Irwin testified that he had not asked the owner of the subject semi-trailer for repair records resulting from the crash. *Id.* at 39. Irwin was also unaware of any testimony by the sheriff's deputy or paramedic at the scene of the accident regarding the damage to the underside of the subject semi-trailer nor did he seek that information from those individuals. *Id.* at 39-40.

If the subject semi-trailer was available, Irwin would look "at the overall shape of the trailer" and inspect it for "minor deformation[s] that visually might not show up in the police officer's photographs which otherwise might show up if [he] scanned it and compared it to a scan model of an undamaged trailer." (Doc. 74-7) at 12, depo. at 75. Irwin would also look at the subject semi-trailer's suspension components. *Id.* at 12, depo. at 76. Irwin further testified that at the time of his deposition, he could not quantify the amount of force the subject semi-trailer contributed to the accident in order to calculate the ultimate speed of the PT Cruiser. (Doc. 71-2) at 41. Even if Irwin could have seen the subject semi-trailer, calculating that force would be "hard." *Id.* at 41-42.

*f. Calculation of Crash Pulse*

Irwin also admitted that he could not provide a precise crash pulse calculation. *Id.* at 42. A "crash pulse is sometimes of interest to a biomechanical expert…." *Id.* Irwin did not know whether his crash pulse calculation would be precise enough for a biomechanical expert. *Id.* Nevertheless, Irwin testified that he believed he had enough information that he "would probably be in a position at some point to quantify the approximate duration of the time of collision and maybe the average rates of deceleration that are consistent with the evidence in the case." *Id.* at 43.

*g. Experience in Reconstructing Accidents Without a Passenger Vehicle or Semi-Trailer*

Irwin testified that he was retained in a separate case, *Baker v. Lufkin*, to reconstruct a passenger vehicle/semi-trailer accident. *Id.* at 34. Like this case, Irwin did not have an opportunity to inspect either the passenger vehicle or the semi-trailer. *Id.* Nonetheless, Irwin offered accident reconstruction opinions that he believed were scientifically reliable by using (1) EDCRASH "to determine energy absorption by the vehicle's front bumper" and to determine "damage to the spring hanger on the trailer," (2) the Trego method to determine "energy absorbed by the roof" of the passenger vehicle, and (3) EDSMAC, another reconstruction software program, to analyze "how the vehicles moved post impact…." *Id.* at 34-35. In *Baker*, Irwin relied on accident scene photographs and post-accident photographs of the passenger vehicle to reconstruct the accident. *Id.* at 37-38. Irwin did not have any 3-D scans of the passenger vehicle. *Id.* at 38. Irwin noted that the semi-trailer in *Baker* was similarly angled to the subject semi-trailer in this case so the crush patterns between the passenger vehicle in *Baker* and the PT Cruiser here are similar. *Id.* at 35. In fact, Irwin testified that in his 21-year career as

an accident reconstructionist he has reconstructed accidents without being able to inspect one or more of the vehicles on "many occasions." *Id.* at 43-44.

## II. The Motion to Dismiss for Spoliation

Defendant contends first that Plaintiff breached her duty to preserve the PT Cruiser and the subject semi-trailer. Second, Defendant contends that Plaintiff's failure to preserve the PT Cruiser and the subject semi-trailer prejudices Defendant's ability to defend the case. Finally, Defendant contends that Plaintiff's culpability and the nature of the prejudice to Defendant warrant a dismissal of the case. Should the Court decide not to dismiss the case, Defendant, alternatively, seeks "a jury instruction that the missing evidence would have been favorable to" Defendant and an order precluding Plaintiff "from eliciting expert testimony regarding the trailer or the car." (Doc. 34) at 10. Plaintiff opposes the Motion to Dismiss in its entirety.

## III. Discussion

As an initial matter, Defendant states that it "moved to dismiss this case for spoliation under the assumption that the VIN identified in the [original] Complaint actually corresponded to the subject trailer…." (Doc. 74) at 5. As noted, the Court dismissed the claims based on that VIN. This Motion to Dismiss is not moot, however, because the Court allowed Plaintiff to amend her Complaint to allege that another Wabash semi-trailer was the subject semi-trailer.

It is well-established that "[p]utative litigants are under an 'obligation to preserve evidence ... when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" *Browder v. City of Albuquerque*, 209 F. Supp. 3d 1236, 1243 (D.N.M. 2016) (citation omitted). "Spoliation sanctions are proper when '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the

destruction of the evidence.'" *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007)). Furthermore, the "court has discretion to fashion an appropriate remedy depending on the culpability of the responsible party and whether the evidence was relevant to proof of an issue at trial." *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 862 (10th Cir. 2005).

*A. Duty to Preserve Evidence*

"[A] party's duty to preserve arises when it has notice that the [evidence] might be relevant to a reasonably-defined future litigation." *Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1164 (D. Colo. 2015). Plaintiff contends that neither she nor her counsel played a role in the spoliation of the PT Cruiser and the subject semi-trailer. Plaintiff also contends that she did not own, possess, or control the subject semi-trailer and that on October 6, 2016, her attorney actually requested that Spurlin Trucking preserve the subject semi-trailer.

As a matter of law, the PT Cruiser became a property of Chambers' estate. *See* "Estate," *Black's Law Dictionary* (11th ed. 2019) (defining "estate" as "property that one leaves after death; the collective assets and liabilities of a dead person"). Upon Chambers' death, Plaintiff, as the personal representative of the estate, had a right to possess or control the PT Cruiser. *See* NMSA 1978, § 45-3-709 (2014 Repl. Pamp.) (stating that "every personal representative has a right to, and shall take possession or control of, the decedent's property"); s*ee also, e.g., AXIS Ins. Co. v. Terry*, 2018 WL 9943825, at *6 (N.D. Ala.) (acknowledging that "a party only has a duty to preserve evidence within its custody, possession, or control, as that is the only sort of evidence a party *can* preserve"). Moreover, Plaintiff contemplated litigation over the accident prior to October 6, 2016, the date of her attorney's letter to Spurlin Trucking. Consequently,

Plaintiff had a duty to preserve the PT Cruiser at that time. Even after Plaintiff settled with the truck driver and Spurlin Trucking, future litigation against the manufacturer of the subject semi-trailer was reasonably foreseeable considering the PT Cruiser under-rode the side of the subject semi-trailer. *Cf. Edwards v. Hearst Commc'ns, Inc.*, 2017 WL 6458612, at \*4 (S.D.N.Y.) (finding no duty to preserve evidence when second lawsuit not reasonably foreseeable). Under those facts, Plaintiff had both the right to possess the PT Cruiser and a duty to preserve the PT Cruiser. Plaintiff, however, did not exercise that right to possess the PT Cruiser and, failing to do so, breached her duty to preserve the PT Cruiser.

On the other hand, Plaintiff did not have custody, possession, or control over the subject semi-trailer, which Spurlin Trucking or McKinney owned. Without custody, possession, or control over the subject semi-trailer, Plaintiff did not have a duty to preserve the subject semi-trailer. *See, e.g., Barnes v. Harling*, 368 F. Supp. 3d 573, 609 (W.D.N.Y. 2019) (citations omitted) (noting that "obligation to preserve is attendant only upon 'the party having control over the evidence ... at the time it was destroyed'"); *Smith v. Norcold, Inc.*, 2014 WL 5817258, at \*6 (E.D. Mich.) (also noting that "duty to preserve evidence does not extend to evidence which is not in a litigant's possession or custody and over which the litigant has no control"). Plaintiff's duty to preserve extends only to the PT Cruiser. Therefore, the Court will analyze the remaining spoliation factors as they pertain to that particular duty.

### B. Prejudice

The moving party carries the burden "to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 167 F.R.D. 90, 104 (D. Colo. 1996). In other words, "[i]t is not enough for a party seeking spoliation

sanctions … to raise an issue of theoretical prejudice—that prejudice cannot be known because the documents and information no longer exist," i.e., the "party seeking spoliation sanctions must present evidence that it was actually prejudiced." *Linnebur v. United Tel. Ass'n, Inc.*, 2012 WL 2370110, at *3 (D. Kan.). "At the same time, courts must be careful that the application of this burden is not too onerous, otherwise the spoliating party might be allowed to profit from its own misconduct." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011).

Defendant concedes that neither it "nor Mr. Irwin contended that a reconstruction could not be performed at all." (Doc. 74) at 5, n. 9. Defendant argues that it is prejudiced because Irwin would have to rely on incomplete and "unverified data from Plaintiff's expert … without the benefit of information regarding energy absorbed … by certain areas of the car." (Doc. 74) at 8. For instance, without any data on damage to the PT Cruiser's undercarriage, Irwin acknowledged that he could not "put a number on how many foot-pounds of energy might have gone into" the undercarriage components. (Doc. 71-2) at 9. Without that kind of information, Defendant asserts the energy calculation will be lower, thereby indicating that Chambers was driving slower than she was.

Defendant cites *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583 (4th Cir. 2001), for the proposition that "a defendant should not be expected to rely upon its adversary's data simply because the party in control of the evidence made the decision to destroy it." (Doc. 74) at 8. In *Silvestri*, the plaintiff filed a products liability action against the defendant alleging that the airbag in the vehicle he was driving did not deploy as warranted when he crashed into a utility pole. *Silvestri*, 271 F.3d at 585. The plaintiff failed to give the defendant notice of his claim and an opportunity to inspect the vehicle before he had the vehicle repaired. *Id.* Prior to repairing the vehicle, the plaintiff's attorney retained two accident reconstructionists, Carlsson and

Godfrey, to inspect the damaged vehicle, visit the accident scene, and, then, "render expert opinions regarding the circumstances of the crash." *Id.* at 586.

> Carlsson examined the vehicle and took photographs. However, he took only one measurement of the vehicle and conducted no inspection of its undercarriage. While the one measurement he took was a "crush" measurement, he made no note of the measurement. At his deposition several years later, he "seem[ed] to recall" that the "crush" measurement was 18 inches, but he could not definitely remember the measurement. Similarly, Godfrey failed to make notes of any measurements that he may have taken during his inspection. He did, however, photograph a ruler on the hood of the vehicle to measure the extent to which the front of the hood was bent off centerline. When inspecting the site of the accident, Godfrey failed to measure the skid marks left by the vehicle, confessing that he formed his initial opinion about Silvestri's speed at the time of the accident by "eyeball[ing]" the skid marks.

*Id.*

The Fourth Circuit agreed with the district court that the spoliation was "highly prejudicial" to the defendant because the spoliation denied the defendant "access to the only evidence from which it could develop its defenses adequately." *Id.* at 594. The Fourth Circuit noted that Defendant "could not develop a 'crush' model to prove that the airbag properly failed to deploy" without "crush measurements taken at several places on the automobile." *Id.* The Fourth Circuit concluded that "the one crush measurement available was unreliable" because Carlsson did not write it down. *Id.* The Fourth Circuit further observed that the defendant "could not resolve the critical question of how [Plaintiff] injured his head" without examining the vehicle. *Id.* Notably, the plaintiff's experts inconsistently opined where the plaintiff hit his head in the cabin of the vehicle and supported those opinions "on changed recollections about the vehicle's condition." *Id.* The Fourth Circuit determined that

> not only was the evidence lost to [the defendant], but the evidence that was preserved was incomplete and indefinite. To require [the defendant] to rely on the evidence collected by [the plaintiff's] experts in lieu of what it could have collected would result in irreparable prejudice.

*Id.*

Plaintiff distinguishes *Silvestre* from this case by noting that in *Silvestre* there was only one unreliable crush measurement. Plaintiff here provided Defendant extensive evidence including a 3-D scan of the PT Cruiser as well as over one hundred photographs of the PT Cruiser and the accident scene from which Irwin can calculate crush measurements. Plaintiff further asserts, that unlike in *Silvestre*, "each of the innumerable crush measurements can be independently calculated from the materials available, which include precise measurements from the 3D[] scan." (Doc. 71) at 12.

Defendant rejects these distinctions on the ground that it should not be expected to rely on data created by Plaintiff's accident reconstructionist which Defendant cannot verify. (Doc. 74) at 9. *Silvestre*, however, does not stand for such a general proposal. Rather, the Fourth Circuit held that the defendant's experts need not rely on scant unreliable evidence produced by the plaintiff's experts. In contrast to *Silvestre*, Defendant here does not specifically assert how the photographs of the PT Cruiser and the 3-D scan produced by Plaintiff's accident reconstructionist are in themselves unreliable. In further contrast to *Silvestre*, Irwin testified that he could reliably reconstruct the accident without those photographs and the 3-D scan by using the movement of center of gravity method, which relies on the photographs taken by the sheriff's deputy at the scene of the accident, not on any data produced by Plaintiff's accident reconstructionist. *Silvestre*, therefore, is factually distinguishable from this case.

Defendant also cites *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, for the proposition that prejudice necessarily occurs when the plaintiff's expert had an opportunity to inspect the vehicle prior to its spoliation while the defendant's expert did not have such an opportunity. 1998 WL 68879 (10th Cir.). In *Jordan F. Miller*, an airplane's "left landing gear collapsed, causing major damage to the airplane...." *Id.* at *1. "An FAA investigator inspected

the airplane shortly after the crash and reported" on the cause of the landing gear collapse. *Id.* Plaintiff Miller subsequently notified his insurance carrier about "the incident and made a claim against his policy." *Id.* The insurer retained counsel "to inspect the aircraft and adjust Miller's claim." *Id.* Miller's insurer then paid to repair the aircraft. *Id.* After the aircraft was repaired, Miller sued the defendants for, among other things, "products liability, based on the collapse of the left landing gear and various other alleged defects in the plane." *Id.* "[A]ll but one of the component parts of the left landing gear had been lost or destroyed." *Id.* at *2. Notably, even the plaintiffs' "own experts had not had an opportunity to inspect or test the landing gear components." *Id.* Two experts retained by the defendants attested in affidavits "why a visual inspection of all the components of the landing gear, as well as testing was critical to the defense." *Id.* at *6.

The Tenth Circuit affirmed the district court's conclusion "that 'hands-on inspection and testing is critical to a fair trial and due process for the Defendants." *Id.* The Tenth Circuit observed that "without visual inspection and testing, the testimony of [the defendants'] experts would be speculative at best." *Id.* The Tenth Circuit also determined that "[g]iven that plaintiffs' agents had the opportunity to visually inspect the landing gear components and, presumably, would testify that their observations supported a finding of liability on the part of [the defendant], we cannot say that the district court erred in rejecting plaintiffs' 'level playing field' argument," i.e., that the plaintiffs' experts, like the defendants' experts, did not have an opportunity to inspect the landing gear components. *Id.*

Plaintiff argues that *Jordan F. Miller* is also distinguishable from this case in several ways. First, Plaintiff notes "that *Jordan F. Miller* does not hold that hands-on inspection and testing is always critical to a fair trial and due process." (Doc. 71) at 13. Second, Plaintiff

contends that the defendants' experts in *Jordan F. Miller* "asserted and explained why inspection and testing were necessary *without ever being impeached on those assertions*." *Id.* Plaintiff observes that "Irwin's conclusory statements in his Affidavit clearly conflict with his deposition testimony acknowledging that hands-on inspection and testing is not required here." *Id.* Third, Plaintiff asserts that, unlike in this case, the defendants' experts in *Jordan F. Miller* did not have access to photographs or a 3-D scan.

Moreover, Plaintiff cites two cases in which courts found no prejudice when the defendant's experts had access to photographs and reports documenting the spoliated evidence. In *Sinclair Wyoming Ref. Co. v. Pro-Inspect Inc.*, a pipe at a refinery ruptured causing a fire. 2014 WL 12768466, *1 (D. Wyo.). OSHA took possession of the ruptured portion of the pipe and had the plaintiff send the pipe to an independent lab for examination. *Id.* Relevant portions of the pipe were subsequently spoliated. *Id.* at *1-2. However, "[m]any, many photographs were taken of the fire site and pipe…." *Id.* The district court found the ruling in *Jordan F. Miller* was not persuasive because "none of the experts for any party opined that the photographic evidence or reports were insufficient to permit them to reach certain opinions." *Id.* at *4.

In *Burlington N. & Santa Fe Ry. Co. v. Grant*, the Tenth Circuit concluded that the defendant was not "meaningfully prejudiced" by the "removal and destruction of portions of the [tar-like material] on [the plaintiff's] property" when the plaintiff "generated extensive documentation of the condition of the land before and during remediation…." 505 F.3d 1013, 1032 (10th Cir. 2007). The Tenth Circuit noted the lack of "meaningful evidence that [the defendant] has been actually, rather than merely theoretically, prejudiced…." *Id.* at 1032-33.

Defendant responds to Plaintiff's argument that *Jordan F. Miller* is distinguishable from this case by first asserting that "[w]hat remains missing from Plaintiff's analysis, of course, is any explanation why [Defendant] should be forced to rely upon Plaintiff's expert's incomplete and unverified work product when it should have been provided an opportunity to undertake its own inspection." (Doc. 74) at 9. Defendant also argues that Irwin's deposition testimony does not impeach his affidavit. Defendant notes that Irwin does not state in his affidavit that he could not reconstruct the accident. Defendant also asserts that "[t]he difference between this case and other cases to which Plaintiff attempts to draw a comparison is that the evidence in this case was destroyed after Plaintiff took the opportunity to retain an expert." *Id.*

The Court gleans from *Jordan F. Miller, Sinclair Wyoming Ref. Co.*, and *Burlington N. & Santa Fe Ry. Co.* the following principle: if either the plaintiff, the plaintiff's agents, or the plaintiff's expert viewed the spoliated evidence prior to its spoliation, prejudice to the defendant occurs if the photographic/documentary evidence related to the spoliated evidence fails to capture the relevant characteristics of the spoliated evidence so that a defendant's expert relying on that photographic/documentary evidence can only render a speculative opinion. As an initial matter, the Court agrees with Defendant that Irwin's deposition testimony does not impeach his affidavit. That being said, except for the movement of center of gravity reconstruction method, Irwin testified that EDCRASH, SIMON, and the Trego method, all reliable tools, would not produce precise results because of the lack of information pertaining to the PT Cruiser. For example, an EDCRASH analysis may not capture energy that might have been absorbed through the movement of the PT Cruiser's power train. With respect to the SIMON simulation, Irwin was concerned that the SIMON analysis would be hypothetical without measurements of the damage to the undercarriage of the PT Cruiser. Irwin also testified that the Trego method would

only produce an estimate of the energies absorbed by the greenhouse structure of the PT Cruiser, because, for example, other damage to the PT Cruiser could lead to an underestimated speed for the PT Cruiser.[2]  In other words, the photographic/3-D scan evidence Irwin had at the time of his deposition did not capture all of the relevant characteristics of the PT Cruiser required for precise energy calculations under EDCRASH, SIMON, and the Trego method.  Even if those reconstruction methods would produce reliable approximations,[3] Irwin's reliance on those approximations would necessarily result in a speculative opinion.[4]

On the other hand, when discussing the movement of center of gravity reconstruction method, Irwin testified that he could use the accident scene photographs taken by the sheriff's deputy to calculate the movement of the vehicles and to reconstruct the accident.  Irwin did not testify that he needed to inspect either the PT Cruiser or the subject semi-trailer to apply this reconstruction method.  Irwin further testified that the movement of the center of gravity analysis "would be scientifically reliable and provide a fair and accurate reconstruction of this crash[.]" (Doc. 71-2) at 23.  In other words, the accident scene photographs capture the relevant characteristics of the PT Cruiser to allow Irwin to reliably and accurately reconstruct the accident using the movement of center of gravity method.  Additionally, the Court notes that this method

---

[2] Irwin further testified in his explanation of the Trego method that he could determine the deformation of the PT Cruiser's pillars only to the extent he could see them in the scanned data and accident scene photographs.  The deformation of the pillars, however, might be more clearly visible in the photographs of the PT Cruiser taken by Plaintiff's accident reconstructionist, photographs Irwin did not have at the time of his deposition.
[3] Irwin also testified that he could only approximate the crash pulse.

[4] Plaintiff points out that Irwin has on many occasions reconstructed accidents without the benefit of vehicles to inspect, citing the *Baker* case.  Irwin, however, does not describe the extent of the photographic evidence he had available to him in *Baker* to reconstruct the accident using EDCRASH, the Trego method, and EDSMAC.

does not require Irwin to rely on data created by Plaintiff's accident reconstructionist, thus alleviating Defendant's concern about its inability to verify that data.

In sum, Defendant has not carried its burden to demonstrating that the spoliation of the PT Cruiser actually prejudices Defendant's ability to defend this case. Consequently, the Court denies the Motion to Dismiss.

IT IS ORDERED that

1. Defendant's request for a hearing is denied; and

2. Defendant's Motion to Dismiss for Spoliation and Supporting Brief (Doc. 34) is denied.

_____
UNITED STATES DISTRICT JUDGE