IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LINDA HAUCK, *as personal representative of the Estate of Deborah A. Chambers*,

      Plaintiff,

vs.                                                                             No. CV 18-471 KG/LF

WABASH NATIONAL CORPORATION,

      Defendant.

MEMORANDUM OPINION AND ORDER

Presently before the Court is Defendant Wabash National Corporation's (Wabash) Motion for Summary Judgment (Motion) (Doc. 137). The Motion is now fully and timely briefed. *See* (Doc. 146, Response, Doc. 149, Reply). The Court notes jurisdiction under 28 U.S.C. § 1332. After review of the parties' briefing and the relevant law, the Court grants in part and denies in part Wabash's Motion (Doc. 137).

    I.     *Undisputed Material Fact Summary*

On the evening of September 6, 2016, Deborah Chambers' PT Cruiser collided into the side of a Wabash dry-van trailer that was pulled across both lanes of traffic on Route 66. (Doc. 137) at 3, ¶ 1. Because of "[t]he mismatch of the deck height of the Wabash trailer and the front of Ms. Chambers' vehicle," Ms. Chambers' drove under, or "under-rode," the trailer, "causing passenger compartment intrusion of Ms. Chambers' vehicle." (Doc. 146) at 5, ¶ 2. Ms. Chambers was severely injured in the accident and later died in the hospital. *Id.* at 1. Linda Hauck, as personal representative, brought this action to recover damages on behalf of Ms. Chambers' estate. *Id.* at 23-24.

At the time of Ms. Chambers' collision, the Wabash trailer was not equipped with a side guard to prevent vehicle under-riding. (Doc. 146) at 8, ¶ 27; (Doc. 137) at 3, ¶ 2. The National Highway Traffic Safety Administration (NHTSA) does not require the installation of side-guard protectors on trailers. (Doc. 137) at 4, ¶ 6. Installation of such a device would "necessarily add weight to [the] trailers." *Id.* at ¶ 10. However, "[v]arious designs of side underride protection have been crash tested on multiple occasions." (Doc. 146) at 6, ¶ 9. Testing of these devices "show the ability of side underride guards to prevent underride and passenger compartment intrusion." *Id.* Furthermore, Federal Motor Vehicle Safety Standards "did not prevent Wabash from equipping its trailers with a side underride guard." *Id.* at 10, ¶ 40. Notably, the NHTSA does require the installation of "rear impact guards," a device that prevents under-riding when a vehicle collides with the back of a trailer. *Id.* at 9, ¶ 28. In accordance with these regulations, a rear impact guard was installed on Wabash's trailer at the time of the accident. (Doc. 137) at 3, ¶ 4.

By the year 2000, "Wabash knew the deck heights of its trailers, and knew that the tops of the fronts of passenger vehicles were less than the deck heights of its trailers." (Doc. 146) at 7, ¶ 17. In addition, Wabash "was aware of the risks that a vehicle could underride its trailers … because the trailer's deck height was higher than the top of the front of most passenger vehicles." *Id.* at ¶ 18. Wabash was also "aware that an underride of its trailers could expose an occupant of a passenger vehicle to risks of injury or death." *Id.* at 8, at ¶ 22. Despite this knowledge, "Wabash had not conducted any testing as it relates to side underride of its trailers." *Id.* at ¶ 25.

Between 2007 and 2010, "Wabash began to develop a side underride guard for its trailers," and received a patent for the design in April 2012. *Id.* at 11, ¶ 46. Since receiving the patent, "Wabash continues its efforts to develop, design, test and commercial a side impact

guard, despite any mandate or requirement by the government for side underride guards on semi-trailers." *Id.* at 13, at ¶ 60.  To date, Wabash has not installed side-guard protectors on its trailers that travel on U.S. roads and highways.  *See id.* at 8, ¶ 27.

## II. Standard

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once the movant meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-movant to set forth specific facts showing a genuine issue for trial.  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).  A fact is "material" if it could effect the outcome of the lawsuit.  *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)).  A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor.  *Tabor*, 703 F.3d at 1215.

## III. Discussion

In its Motion, Wabash requests summary judgment on each of Ms. Hauck's two claims for relief, strict products liability and negligence.  (Doc. 137) at 6-13.  Alternatively, Wabash argues that if Ms. Hauck's claims survive summary judgment, this Court should conclude that she is unable to recover punitive damages.  *Id.* at 13-14.  Finally, Wabash asserts that because Ivy Chambers, Deborah Chambers' surviving daughter and statutory beneficiary, did not participate in discovery, she should be barred from receiving any damages awarded in this case.

*Id.* at 14.  Ms. Hauck contests the basis for each of Wabash's arguments in favor of summary judgment.  *See* (Doc. 146).  As a result, the Court will address each of Wabash's contentions in turn.

        A.   *Strict Products Liability Claim*

To recover under a strict products liability theory in New Mexico, a plaintiff must demonstrate that: (1) "the product was defective;" (2) "the product was defective when it left the hands of the defendant and was substantially unchanged when it reached the user or consumer;" (3) "because of the defect the product was unreasonably dangerous to the user or consumer;" (4) "the consumer was injured or damaged;" and (5) "the defective product was the proximate cause of the injury or damage." *Garner v. Raven Indus., Inc.*, 732 F.2d 112, 114 (10th Cir. 1984).  In considering whether a product is "unreasonably dangerous," a plaintiff must demonstrate that "a reasonably prudent person having full knowledge of the risk would find [the risk] unacceptable." *Bustos v. Hyundai Motor Co.*, 2010-NMCA-090, 149 N.M. 1, at *12 (citing UJI 13-1407 NMRA).  The question of "[w]hether a product is unreasonably dangerous, and therefore defective, is ordinarily a question for the jury." *Nowell v. Medtronic, Inc.*, 372 F.Supp. 3d 1166, 1228 (D.N.M. 2019) (Browning, J.) (quoting *Smith ex rel. Smith v. Bryco Arms*, 2001-NMCA-090, ¶ 14, 131 N.M. 87).

When considering whether a product is defective to support liability, the jury is instructed to engage in "a risk-benefit calculation" and "balance meritorious choices for safety made by the manufacturer while minimizing the risk that the public will be deprived needlessly of beneficial products." *Id.* (quoting *Smith*, 2001-NMCA-090, at ¶ 14).  In reaching its conclusion, the jury may consider:

> (1) the usefulness and desirability of the product…; (2) the availability of other and safer products to meet the same need…; (3) the likelihood of injury and its

4

> probable seriousness, i.e., 'risk,'…; (4) the obviousness of the danger…; (5) common knowledge and normal expectation of the danger (particularly for established products)…; (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings)…; and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

*McDonald v. Zimmer, Inc.*, 2020-NMCA-020, ¶ 33, 461 P.3d 930 (citing UJI 13-1407 NMRA, committee notes).

The parties dispute whether Ms. Hauck can establish that Wabash's trailer was unreasonably dangerous and, thus, whether a jury could conclude it was defective and reach a verdict in her favor. Ms. Hauck presents significant evidence of the risk, obviousness, and common knowledge associated with driving a trailer unequipped with a side-guard protector. Most notably, Wabash agreed that it "w[as] discussing side underride and side underride guards at least as of 2007." (Doc. 147) at 10, ¶ 44. In addition, Wabash developed its own "side underride guard for its trailers, filing a patent for a side underride guard in April of 2010[.]" *Id.* at 11, ¶ 46. By 2016, Wabash admits it was moving forward "with development and testing of a side impact guard to commercialize a guard able to stop a passenger from underride with no passenger compartment intrusion." *Id.* at ¶ 49. In 2017, "Wabash developed and displayed a side impact guard at a commercial motor vehicle show." *Id.* at ¶ 53.

Wabash then installed on its trailer, for purposes of testing, a side-guard protector. *Id.* at 12, ¶ 56. At present, "Wabash continues its efforts to develop, design, test and commercial a side impact guard, despite any mandate or requirement by the government for side underride guards on semi-trailers." *Id.* at 13, ¶ 60. Wabash further admitted that the purpose of its side-guard protector was specifically developed to prevent and minimize "the risk of passenger compartment intrusion of passenger vehicles that may strike the side of a Wabash trailer." *Id.* at ¶ 61.

5

While this evidence is not conclusive on the elements of risk, obviousness, or common knowledge, it is sufficient for a reasonable jury to construe the facts in favor of Ms. Hauck. *See Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (internal citation omitted) (explaining that "issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant"). Indeed, Ms. Hauck has presented evidence, which, if the jury accepts, demonstrates that Wabash independently researched, tested, and designed its own mechanism for protecting against vehicle underride. Based on this evidence, the jury could infer that this danger was obvious, foreseeable, common knowledge, and, therefore, unreasonable, rendering the product defective. In arguing to the contrary, Wabash asserts that "Ms. Hauck must present proof of a feasible alternative design to support her strict liability claim." (Doc. 149) at 8.

However, "[u]nder New Mexico law, the existence of a reasonable alternative design is a relevant consideration by a jury but, contrary to Defendants' argument, a specific finding on this issue is not required." *Bustos*, 2010-NMCA-090, at ¶ 54 (citing *Morales v. E.D. Etnyre & Co.*, 382 F.Supp. 2d 1278, 1284 (D.N.M. 2005)). Indeed, "while a jury is required to make risk-benefit calculations, consideration of alternative designs is but one of several risk-benefit considerations that a jury *may* balance in determining whether a product created an unreasonable risk of injury." *McDonald*, 2020-NMCA-020, at ¶ 33 (emphasis in original) (citing *Bustos*, 2010-NMCA-090, at ¶ 54). New Mexico courts have endorsed an "unreasonable-risk-of-injury" test that allows "argument under any rational theory of defect." *Id.* (citing *Brooks v. Beech Aircraft Corp.*, 1995-NMSC-043, ¶ 32 n.2, 120 N.M. 372).

In this way, "the New Mexico Supreme Court made clear that a 'defect giving rise to strict products liability is not measured by comparison with a prototype.'" *Bustos*, 2010-NMCA-090, at ¶ 54 (quoting *Brooks*, 1995-NMSC-043, at ¶ 32). The *Morales* opinion, which Wabash

cites in support of its position, has been subsequently applied by New Mexico courts for the principle that "a 'rigid showing in the plaintiff's prima facie case'" of a feasible alternative design is not required. *See id.* at ¶ 57 (quoting *Morales*, 382 F.Supp. 2d at 1284). However, in framing the holding in *Morales*, the *Bustos* Court recognized that a plaintiff cannot "come to court and merely criticize a product." *Id.* at ¶ 57 (quoting *Morales*, 382 F.Supp. 2d at 1284).

Consistent with New Mexico precedent, this Court is not persuaded that such a rigid "requirement" of a feasible alternative design exists under the theory of strict products liability. *Cf. Morales*, 382 F.Supp. 2d at 1283-84 (concluding in 2010 that "plaintiff had to show an alternative design") *with Bustos*, 2010-NMCA-090, at ¶ 57 (interpreting *Morales* and finding New Mexico law does not require "prima facie" evidence of alternative design) and *McDonald*, 2020-NMCA-020, at ¶ 33 (interpreting New Mexico law in 2019 and concluding "consideration of alternative designs is but one of several risk-benefit considerations that a jury *may* balance") (emphasis in original). Simply stated, while *Morales* may have claimed such a standard exists, that requirement has been limited and refined by subsequent New Mexico Court of Appeals decisions. *See id.*

As a diversity action involving the question of New Mexico state law, this Court must follow the legal reasoning and restrictions adopted by New Mexico courts. *See Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (explaining that "under diversity jurisdiction, the task of the federal court is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law"). This is especially true, where, as here, the mandate for a rigid showing of alternative designs has been repeatedly denounced by the state court. *See Bustos*, 2010-NMCA-090, at ¶ 56 (internal citation omitted) (explaining that *Morales* "forecast[ed]" what the New Mexico Supreme Court "would most

likely" do, but "*Brooks* had already recognized that New Mexico's existing law, at least to some degree, applies the risk-utility considerations advocated by the Restatement (Third)").

Nevertheless, to the extent that New Mexico law can be construed to require a feasible alternative design, Ms. Hauck has provided evidence that if the jury finds probative and accepts, can be utilized to infer the existence of a feasible alternative design. Most notably, Ms. Hauck presents evidence that Wabash manufactured and placed a side-guard protector on its trailers for testing and began discussing the inclusion of such devices over a decade ago, in 2007. *See McDonald*, 2020-NMCA-020, at ¶ 32 (explaining testimony "and exhibits such as research articles and [defendant's] own internal data" supported conclusion that product was defective). In addition, Ms. Hauck presents a host of exhibits in support of alternative designs, which the jury may assess during its risk-benefit calculus and evaluation of Wabash's ability to eliminate the danger. *See* (Doc. 146-5) at 23 (explaining sideguard testing in 2008); *id.* at 24 (explaining sideguard testing in 2006); *id.* at 25-31 (analyzing news excerpts and articles on underride guards). This Court is, therefore, satisfied that even if New Mexico law requires proof of a feasible alternative design, Ms. Hauck has presented sufficient evidence from which the jury could infer that such a design existed. *Accord McDonald*, 2020-NMCA-020, at ¶ 34 (concluding that evidence of "Defendants already market[ing] a design that avoids the risk … suffice[s] to demonstrate that [] court considered the ability to eliminate the danger without impairing the usefulness of the product or rendering it unduly expensive").

In conclusion, Ms. Hauck has presented sufficient evidence to demonstrate that, when considering the risk-benefit calculation to ascertain the dangerousness of Wabash's tractor-trailer design, a reasonable jury could find in her favor and ultimately conclude that the product was unreasonably dangerous and defective. In addition, even if New Mexico law requires proof of a

feasible alternative design, Ms. Hauck has presented sufficient evidence to prove the existence of design alternatives—including Wabash's own blueprints and design plans.  Thus, despite the exclusion of Mr. Ponder and Dr. Batzer's testimony, the Court is not persuaded that judgment should be afforded as a matter of law.  Therefore, the Court concludes that summary judgment in favor of Wabash is not appropriate on Ms. Hauck's strict products liability theory of recovery.  For these reasons, the Court denies Wabash's Motion on this claim.

      *B.  Negligence Claim*

To sustain a negligence claim under New Mexico law, a plaintiff must demonstrate "a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause."  *Nowell*, 372 F.Supp. 3d at 1225 (citing *inter alia*, *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 134 N.M. 43).  In determining whether a defendant has breached a duty owed to the plaintiff, the fact finder must ascertain "what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  *Herrera*, 2003-NMSC-018, at ¶ 33.  This inquiry is inherently "factual," and requires the trier of fact to determine whether a defendant acted "reasonably or negligently" under the circumstances.  *Id.*

Wabash contends that Ms. Hauck cannot demonstrate that its trailer was "unreasonably dangerous."  (Doc. 137) at 12.  However, Ms. Hauck presents a detailed history of the risks associated with driving a trailer not equipped with a side-guard protector.  Most notably, Ms. Hauck attaches a detailed report, authored by Paul Lewis, explaining the injuries Ms. Chambers sustained because of the vehicle underride in her collision.  (Doc. 146-5) at 8.  Mr. Lewis details that Ms. Chambers would have survived if a side underride protector was installed on Wabash's

9

trailer at the time of the collision. *Id.* at 31. In addition, Mr. Lewis explains that Ms. Chambers was travelling at 27 miles per hour when her vehicle collided with the trailer, and she was unable to see the trailer stretching across her travel lane because its headlights produced a "wall of light." *Id.* at 21.

Mr. Lewis further explains that, because no side-guard protector was installed on the trailer, it took first responders ten minutes to remove Ms. Chambers from her vehicle, as she "moaned," "unresponsive," and pinned inside the vehicle. *Id.* at 4. After removing her from the vehicle, she declined from "minimally responsive at scene" to being intubated and sedated. *Id.* at 5. Ultimately, she sustained "multiple intracranial injuries and cervical spine injuries" and her neurological status "continued to decline over the course of her stay" at the hospital. *Id.* at 8. Mr. Lewis explains that Ms. Chambers was extubated at the hospital and within two hours, she was pronounced dead. *Id.*

This evidence is sufficient to demonstrate an "unreasonable risk of injury." Specifically, a jury could conclude that this risk, stemming from a vehicle travelling 27 mph and colliding with a trailer that it could not adequately see because of its headlights—resulting in a ten-minute extraction and a week in the hospital before death—is unreasonable. At a minimum, this evidence is colorable to the point that a jury could conclude that a reasonably prudent manufacturer should have foreseen injuries of this nature, and Wabash, therefore, failed to mitigate the unreasonable risk of injury and death.

Wabash combats this contention by arguing that because no trailer manufacturers currently utilize side-guard protectors, its current design cannot be considered unreasonably dangerous, or otherwise subject it to a negligence holding. (Doc. 137) at 13. However, "evidence of industry custom or usage, and evidence of compliance with applicable regulations,

10

is relevant to whether the manufacturer was negligent or whether the product poses an unreasonable risk of injury, but that such evidence should not conclusively demonstrate whether the manufacturer was negligent or the product was defective." *Brooks*, 1995-NMSC-043, at ¶ 38.  The New Mexico Supreme Court explained, "[w]e hesitate to embrace a standard that would allow an industry to set its own standard of reasonable care and to determine how much product-related risk is reasonable." *Id.* at ¶ 40; *see also Gonzales v. Surgidev Corp.*, 1995-NMSC-036, ¶ 49, 120 N.M. 133 (concluding evidence of compliance with federal regulations "is not dispositive of the issue of negligence or recklessness").

Taking the facts in the light most favorable to Ms. Hauck and drawing all reasonable inferences in her favor, this Court concludes a reasonable jury could find that Wabash's trailer posed a foreseeable and unreasonable risk of injury under the circumstances, even though it complied with federal regulatory guidelines and requirements.  *See also Rivera v. Volvo Cars of North America, LLC*, 2015 WL 11118064, at *10 (D.N.M.) (Gonzales, J.) (denying summary judgment for manufacturer even though "subject vehicle complied with all governmental standards, the subject switch is non-defective according to Defendant['s] [] expert, [] and there is no evidence of prior [] cases involving [the malfunction]").  As a result, the Court denies summary judgment for Wabash on Ms. Hauck's negligence claim.

### C.  Punitive Damages

To be liable for punitive damages under New Mexico law, "a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." *Clay v. Ferrellgas, Inc.*, 1994-NMSC-080, ¶ 12, 118 N.M. 266.  For conduct to be deemed "reckless" to support an award of punitive damages, the wrongdoer must engage in "the intentional doing of an act with utter indifference to the

consequences." *Id.* at ¶ 15.  In addition, "compliance with federal regulations does not preclude a finding of recklessness or an award of punitive damages." *Gonzales*, 1995-NMSC-036, at ¶ 49.

Ms. Hauck presents evidence that the danger of vehicle underride was well known to Wabash and within the trailer industry for at least two decades, a fact Wabash does not dispute. *See* (Doc. 146) at 7, ¶ 18 ("As of at least the year 2000, Wabash was aware of the risks that a vehicle could underride its trailers").  As a result, a reasonable jury could conclude that Wabash's intentional decision to not install side-guard protectors on its trailers amounted to "utter indifference to the consequences," most notably, the consequences Ms. Chambers suffered after her vehicle under-rode the Wabash trailer.  Therefore, summary judgment on the issue of punitive damages is not appropriate because, given the undisputed material facts, a reasonable jury could find in favor of Ms. Hauck and conclude that Wabash's refusal to install side-guard protectors was, at a minimum, reckless.  The Court, thus, denies Wabash's request on this claim.

### D.  Ivy Chambers

Lastly, Wabash asserts that Ivy Chambers, the daughter of Ms. Chambers, should be precluded from recovering damages in this case because she did not participate in discovery and failed to submit to a deposition.  (Doc. 137) at 14.  Notably, any damages awarded in this case will go to Ms. Chambers' estate, not her individual descendants, and Ivy Chambers is not a named Plaintiff in this lawsuit.  As a result, the estate's distribution of any damage award in this case, including whether it distributes funds to Ivy Chambers, is plainly outside the scope of this Court's jurisdiction.  Simply stated, the question of asset distribution is handled by Ms. Chambers' estate, and this Court cannot command how those funds are distributed.

However, the Court construes Wabash's argument as one based in equity: that is, because Ivy Chambers refused to participate or submit to questioning by defense counsel, Ms. Hauck cannot argue that any damage award should reflect calculations of the injuries Ivy Chambers sustained as a result of her mother's death. To the extent that this is Wabash's argument, the Court agrees. As a sanction for her failure to participate in discovery, and her refusal to be deposed, the Court will restrict Ms. Hauck from presenting evidence on the damages Ivy Chambers sustained because of Ms. Chambers' death. The ultimate distribution of the estate's funds, however, is left to the sound discretion of Ms. Hauck, as the executive of Ms. Chambers' estate. On this argument, therefore, the Court finds in favor of Wabash.

IV.     *Conclusion*

Based on the undisputed material facts of this case, the Court concludes that a reasonable jury could find in favor of Ms. Hauck on her claims for strict products liability, negligence, and punitive damages. As a result, the Court denies Wabash's request for summary judgment on these claims. In addition, because Ivy Chambers did not participate in discovery or submit to questioning regarding the scope and extent of her injuries, Ms. Hauck may not present evidence of her injuries to argue a calculable award of damages apportioned to her in any final judgment or award. Therefore, the Court grants in part and denies in part Wabash's Motion for Summary Judgment (Doc. 137).

IT IS, THEREFORE, ORDERED that:

1. Wabash is not entitled to summary judgment on Ms. Hauck's claims for strict products liability, negligence, and punitive damages; and

2. Ms. Hauck is precluded from arguing a damage award before the jury that includes calculations of Ivy Chambers' damages, as a sanction for her failure to participate in discovery and her refusal to be deposed.

_____
UNITED STATES DISTRICT JUDGE