**FILED**

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT

MAR 1 2 2021

FOR THE DISTRICT OF NEW MEXICO

**MITCHELL R. ELFERS**
CLERK OF COURT

2:35 pm

LINDA HAUCK, *as personal
representative of the Estate of
Deborah A. Chambers,*

Plaintiff,

vs.                                                                    No. CV 18-471 KG/LF

WABASH NATIONAL CORPORATION,

Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Plaintiff Linda Hauck's Motion to Exclude Certain

Opinions and Testimony of Defendant's Retained Expert Christopher Bonanti (Doc. 153),

Motion to Exclude Certain Opinions and Testimony of Defendant's Retained Expert Andrew

Irwin (Doc. 154), and Motion to Exclude Certain Opinions and Testimony of Defendant's

Retained Expert Lars Reinhart, M.D. (Doc. 155).  The Motions are now fully and timely briefed.

*See* (Docs. 161, 162, 163, Responses, and Docs. 167, 168, 171, Replies).  The Court notes

jurisdiction under 28 U.S.C. § 1332.  After review of the parties' briefing and the relevant law,

the Court grants in part and denies in part Ms. Hauck's Motion to Exclude Christopher Bonanti

(Doc. 153), grants in part and denies in part the Motion to Exclude Andrew Irwin (Doc. 154),

and grants in part and denies in part the Motion to Exclude Lars Reinhart (Doc. 155).

*I.      Background & Procedural Posture*

This case arises from the 2016 death of Deborah Chambers, after her vehicle collided

with the side of a tractor-trailer manufactured by Defendant Wabash National Corporation

(Wabash).  (Doc. 121) at 4.  Ms. Hauck, as personal representative, brought this action for

negligence and strict products liability against Wabash. *Id.* at 4-9. In her Complaint, Ms. Hauck contends that Wabash's failure to install a side-guard protector to prevent vehicle underride resulted in Ms. Chambers' fatal injuries. *See id.*

Previously, this Court granted in part and denied in part Wabash's Motion (Doc. 136), requesting exclusion of certain opinions proffered by Ms. Hauck's experts, Mr. Ponder and Dr. Batzer. (Doc. 173). In pertinent part, the Court concluded that Mr. Ponder and Dr. Batzer's opinions concerning the availability of a feasible alternative design were unreliable and, thus, excluded these opinions under Federal Rule of Evidence 702. *Id.* In addition, the Court granted in part and denied in part Wabash's Motion for Summary Judgment (Doc. 137), concluding that a reasonable jury could find in Ms. Hauck's favor on the questions of negligence and strict products liability. (Doc. 174).

Presently, Ms. Hauck requests to exclude testimony from three of Wabash's experts: Christopher Bonanti, Andrew Irwin, and Lars Reinhart. *See* (Docs. 153, 154, 155). Wabash rejects the bases for each of Ms. Hauck's requests for exclusion. *See* (Docs. 161, 162, 163). The Court determines that it has sufficient evidence to evaluate the experts' testimony without a hearing. *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1228 (10th Cir. 2003) (explaining that "district court has discretion to limit the information upon which it will decide the *Daubert* issue.").

## II.     Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony, directing that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, a district court must conduct a two-step "gatekeeping" analysis to determine the admissibility of expert opinions. *Kumho Tire., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993)); *Milne v. USA Cycling, Inc.*, 575 F.3d 1120, 1134 (10th Cir. 2009). First, a court must assess whether the expert is "qualified," by ascertaining their "knowledge, skill, experience, training, or education." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (citing Fed. R. Evid. 702). For an expert to be deemed qualified under the Federal Rules, their testimony must be "relevant" to the issues before the court. *Daubert*, 509 U.S. at 591. Second, a court must determine whether the expert's opinion is "reliable." *Id.* at 593-94. An expert's opinion must be both relevant and reliable to be admissible. *Milne*, 575 F.3d at 1134.

The party that proffers the expert testimony bears the burden of proving its compliance with Rule 702 by a preponderance of the evidence. Fed. R. Evid. 702 Advisory Committee Note (2000) (citing Fed. R. Evid. 104(a)). Nonetheless, a court should liberally admit expert testimony. *United States v. Gomez*, 67 F.3d 1515, 1526 (10th Cir. 1995) (citing *Daubert*, 509 U.S. at 588). Furthermore, a court is afforded broad "discretion in determining the competency of an expert." *Id.* at 1525 (internal citation omitted).

III.    *Discussion*

In her Motions, Ms. Hauck seeks exclusion of Mr. Bonanti, Mr. Irwin, and Dr. Reinhart's opinions on two grounds. First, Ms. Hauck contends Mr. Bonanti and Mr. Irwin's opinions are irrelevant. *See* (Docs. 153, 154). Second, Ms. Hauck asserts that, to the extent the opinions are

relevant for the jury's consideration, each of the three expert opinions are unreliable.  *See* (Docs. 153, 154, 155).  The Court will address each of Ms. Hauck's arguments for exclusion in turn.

### A.  Whether the Opinions are Relevant

The first question before the Court is whether the experts' opinions are relevant.  *See* (Docs. 153, 154).  Evidence is considered "relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  *United States v. Ibarra-Diaz*, 805 F.3d 908, 928-29 (10th Cir. 2015).  If evidence is not relevant, it is inadmissible.  *United States v. Guardia*, 135 F.3d 1326, 1328 (10th Cir. 1998) (quoting Fed. R. Evid. 402).  Otherwise, a court should admit relevant evidence.  *Ibarra-Diaz*, 805 F.3d at 929 (citing Fed. R. Evid. 402).  Nonetheless, Rule 403 "permits a court to 'exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'"  *Id.*

### 1. Mr. Bonanti's Opinions

Ms. Hauck first challenges the relevancy of Mr. Bonanti's opinions.  *See* (Doc. 153).  Ms. Hauck objects to several of the conclusions Mr. Bonanti reaches, including his opinions regarding:  (1) NHTSA's rulemaking process; (2) why side underride protection regulations do not exist; (3) whether the trailer is "defective" and "technologically and economically feasible"; and (4) NHSTA's consideration of computer-model testing.  *Id.* at 3-4.

In proffering these objections, Ms. Hauck explains the jury's task of weighing the risk-benefit calculus to determine whether Wabash's actions presented "an unreasonable risk of injury" to support a finding of strict products liability.  *Id.* at 9 (internal quotations omitted).  Ms.

Hauck further explains that "in assessing … whether the product design poses an unreasonable risk of injury, a court should not be restricted to determining whether the manufacturer's design complied with any applicable government regulations and industry standards." *Id.* at 10. Ms. Hauck emphasizes that "such regulations and standards, while probative of what a reasonably prudent manufacturer would do, should not be conclusive." *Id.*

In this way, Mr. Bonanti's assessment detailing the relevant industry standards, controlling regulations, and the non-use of computer-model testing and side underride guards are relevant to the jury's inquiry. *See Rivera v. Volvo Cars of North America, LLC*, 2015 WL 11118064, at *8 (D.N.M.) (Gonzales, J.) (citing Fed. R. Evid. 702) (explaining that "testimony of the automotive industry customs, standards, and practices, may be helpful to the jury, as the average juror may not be knowledgeable about the practices"). Specifically, the case law Ms. Hauck cites plainly explains that industry "regulations and standards" are "probative of what a reasonably prudent manufacturer would do." *See* (Doc. 153) at 9-10 (quoting *Brooks v. Beech Aircraft Corp.*, 1995-NMSC-043, ¶ 41, 902 P.2d 54).

Therefore, while Mr. Bonanti's assessment is not dispositive on the question of reasonableness—and the jury is ultimately free to disregard this evidence in its risk-benefit calculus—it, nevertheless, remains a relevant factor for the jury's consideration. *See* Fed. R. Evid. 401, Advisory Committee Notes (explaining that "[e]vidence which is essentially background in nature … is universally offered and admitted as an aid to understanding"). For these reasons, the Court concludes that Mr. Bonanti's testimony regarding the NHTSA's historical rule-making process, standards for side underride protectors, and non-reliance on computer-model testing are relevant and useful to the jury's risk-benefit calculus.

Notwithstanding this conclusion, Wabash must confine Mr. Bonanti's testimony regarding the applicable regulations to the contours of what is relevant, and what would assist the trier of fact, in this case. Mr. Bonanti's detailed "overview" of the Federal Agency Rulemaking Process includes references to President Richard Nixon's procedural and analytical requirements employed while in Office, and President William Clinton's Executive Orders from 1993. *See* (Doc. 153-1) at 8-9. The Court is strained to accept that testimony of the NHTSA's history, dating back several decades before the trailer's manufacture and the accident at issue, will be relevant. *See Raley v. Hyundai Motor Co.*, 2010 WL 199976, at *4 n.6 (W.D. Okla.) (holding that testimony that "discusses at some length the impact of industry contacts with President Nixon and others during the Watergate era, almost forty years ago" should not be elicited from the expert). As a result, Wabash must narrowly dictate the appropriate scope of the testimony it elicits from Mr. Bonanti before the jury.

In addition, Mr. Bonanti's opinions that the trailer is "not defective" under NHTSA standards falls outside the ambit of appropriate evidence for the jury's consideration. While this testimony is relevant, any probative value is greatly outweighed by its threat of confusing the issues and misleading the jury. *See* Fed. R. Evid. 403 (explaining that "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … confusing the issues … [or] misleading the jury). In reaching this conclusion, the Court is particularly persuaded by the reasoning employed in the opinion Wabash relies on, *Raley*, 2010 WL 199976. In *Raley*, the court concluded that an expert's opinion that federal regulations do not certify the vehicle "as 'safe' or that compliance doesn't mean a vehicle is safe or state of the art" are "legal conclusions and would essentially have the expert offering opinions that are, in substance, the arguments of counsel." 2010 WL 199976, at *4; *see also Beane v. Utility Trailer Manu. Co.*,

2013 WL 12183592, at *3 (W.D. La.) (quoting *Raley* and excluding testimony that federal regulations do "not certify vehicles as safe or that compliance doesn't mean a vehicle is 'safe' or state of the art" because the opinions are "objectionable legal conclusions").  This Court agrees with the reasoning advanced by the district courts in *Raley* and *Beane*.

Principally, Mr. Bonanti's testimony on whether the trailer was "defective" would confuse the issues, because the ultimate question of liability is whether the trailer was defective under New Mexico products liability law, not NHTSA regulatory standards.  In reaching this conclusion, the Court notes that any probative value from Mr. Bonanti's opinion is substantially outweighed by the threat of confusion and misleading the jury.  *See Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) (internal citation omitted) ("[w]hile expert witnesses may testify as to the ultimate matter at issue … this refers to testimony on ultimate facts; testimony on ultimate questions of law, *i.e.*, legal opinions or conclusions, is not favored").  As a result, the Court will exclude Mr. Bonanti's testimony on whether the product was defective.

Similarly, Ms. Hauck asserts that Mr. Bonanti's opinion that side-guard protectors are not "economically and technologically feasible" would confuse the jury.  (Doc. 153) at 15-16.  Ms. Hauck contends that Mr. Bonanti's opinion regarding economic and technological feasibility, and the methods he relies on to calculate these measures, are inconsistent with the standards under New Mexico strict products liability law.  *Id.*  In combatting this contention, Wabash illustrates several of the concerns that may lead to juror confusion and misleading the issues.  Importantly, Wabash notes that "[i]f the Court were to accept [Ms. Hauck's] argument regarding economic feasibility, it would necessarily lead to the exclusion of the opinions of [Dr.] Batzer and [Mr.] Ponder on the same subject." (Doc. 163) at 9.  Wabash further explains, "[a] point that

is often blurred in these types of cases is that the trailer industry and trucking industry are not the same." *Id.* at 9-10.

Given the concerns highlighted by Ms. Hauck, and expounded upon by Wabash, the Court agrees that Mr. Bonanti's use of the terms "economically and technologically feasible" may result in juror confusion. *See Anderson*, 499 F.3d at 1237 (concluding that expert in defamation case cannot opine on whether news broadcast was "newsworthy" or an "issue of public concern" because "this determination … is the ultimate question of law"); *Troudt v. Oracle Corp.*, 369 F.Supp.3d 1134, 1142 (D. Colo. 2019) (explaining that expert in ERISA case cannot "purport to define the meaning of 'prudence' … [because] the question whether a fiduciary has acted prudently under ERISA is informed by legal precepts and precedents to which [expert] may not testify").

The Court notes that Wabash may still elicit testimony regarding the economic and technological challenges associated with installing a side-guard protector. *See Specht v. Jensen*, 853 F.2d 805, 809-10 (10th Cir. 1988) (explaining that "expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function"). However, in preserving the jury's duty to reach findings of fact, it is prudent to leave the proper application of legal principles, as elicited through expert testimony, to the skilled expertise of counsel. *See id.* at 810 (explaining that "when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed").

In summary, Wabash may not elicit testimony from Mr. Bonanti on whether NHTSA standards render a trailer "defective," or "not defective," and, similarly, Mr. Bonanti may not opine on whether a side-guard protector is "economically and technologically feasible." In

reaching this conclusion, the Court notes that the purpose of expert testimony is to assist the trier of fact, and the misuse of legal terms will confuse the jury on the scope of its duty.  Furthermore, the Court concludes that Ms. Hauck's remaining objections regarding the relevancy of Mr. Bonanti's opinions are denied.  However, Mr. Bonanti must stay within a reasonable scope when opining on the history of NHTSA regulations and its current rule-making criteria for side-guard protectors.  The Court will not permit Wabash to present a full-fledged case on regulatory guidance and industry standards, an issue that is only one, of several, relevant considerations for the jury's risk-benefit calculus.

### 2. Mr. Irwin's Opinions

Next, Ms. Hauck challenges the relevance of several of Mr. Irwin's conclusions.  *See* (Doc. 154).  In her Motion, Ms. Hauck asserts that Mr. Irwin's opinions are irrelevant because his conclusions are "based upon daytime [testing] conditions," and the accident at issue occurred at night.  *Id.* at 2.  Ms. Hauck challenges the relevancy of Mr. Irwin's opinions regarding both (1) the visibility of intersection/traffic 1000 feet away; and (2) the traffic study.  *Id.* at 7-10.

In pertinent part, Mr. Irwin conducted a traffic study of the accident scene and proffered a list of opinions that he deduced from his observations and testing.  *See* (Doc. 154-1) at 7-15.  In addition, Mr. Irwin assessed "the visibility at the scene," and concluded that "the intersection and left turning traffic at the intersection would be in view from not less than 1000 feet away when traveling eastbound toward the intersection."  *Id.* at 7.

Mr. Irwin's Report, detailing the visibility of Wabash's trailer at the time of the collision, is relevant to Ms. Hauck's claims.  In particular, the jury may use Mr. Irwin's findings, and other evidence of the factual circumstances surrounding the accident, to assess whether operating the trailer without a side-guard protector was "unreasonably dangerous."  *See* Fed. R. Evid. 401,

Advisory Committee Notes (explaining that "fact to be proved may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action"). The Court illustrated this conclusion in its Memorandum Opinion and Order, denying Wabash's Motion for Summary Judgment. *See* (Doc. 174) at 10.

Specifically, the Court explained that Ms. Hauck's expert opined that "Ms. Chambers was travelling at 27 miles per hour when her vehicle collided with the trailer, and she was unable to see the trailer stretching across her travel lane because its headlights produced a 'wall of light.'" *Id.* The Court then opined that "a jury could conclude that this risk, stemming from a vehicle travelling 27 mph and colliding with a trailer that it could not adequately see because of its headlights—resulting in a ten-minute extraction and a week in the hospital before death—is unreasonable." *Id.* As this Court previously explained, the factual circumstances surrounding Ms. Chambers' death may be utilized by the trier of fact in ascertaining the risk-benefit calculus. To the extent that Ms. Hauck's own expert testimony regarding speed and visibility is relevant, so too is Wabash's expert opinion. For these reasons, Mr. Irwin's conclusions regarding visibility, the traffic study, and the speed and braking data extrapolated therefrom, are relevant to the ultimate questions before the jury.

In addition, the Court rejects Ms. Hauck's contention that Mr. Irwin's Report is irrelevant because it did not mirror the lighting conditions from the time of the accident. Ms. Hauck's argument regarding the lighting distinction is more aptly framed as a challenge to the reliability of Mr. Irwin's conclusions—*e.g.*, whether his opinions are inadmissible because the testing he conducted relied on different conditions than those apparent at the time of the accident. As a result, the Court will assess Ms. Hauck's argument relating to the lighting conditions under the framework of reliability, discussed in detail below.

### B.  Whether the Opinions are Reliable

The second question before the Court is whether the experts' opinions are reliable.  *See*

(Docs. 153, 154, 155).  In determining whether an expert's opinion is reliable, a court "must

assess the reasoning and methodology underlying the expert's opinion…."  *United States v.*

*Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (internal citation omitted).  To make this

determination, a court may consider:

> (1) Whether the theory at issue can be and has been tested; (2) whether the theory
> has been subjected to peer review and publication; (3) whether there is a known or
> potential rate of error and whether there are standards controlling the
> methodology's operation; and (4) whether the theory has been accepted in the
> relevant scientific community.

*Id.* (citing *Daubert*, 509 U.S. at 593-94).  A court is not required "to admit opinion evidence

which is connected to existing data only by the *ipse dixit* of the expert."  *Norris v. Baxter*

*Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005).  As a result, a court "may conclude that

there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*

### 1. Mr. Bonanti's Opinions

Ms. Hauck first challenges the reliability of Mr. Bonanti's opinions.  (Doc. 153).

Specifically, Ms. Hauck contends the following opinions proffered by Mr. Bonanti are

unreliable: (1) why side underride protection regulations do not exist; (2) that the NHTSA does

not consider computer modeling, including finite element analysis; and (3) that installing a side

underride guard would impede the utility of trailers and has the potential to add trailers on

highways and increase the likelihood of accidents.  *Id.* at 2-4.

First, Ms. Hauck argues that Mr. Bonanti's opinion "as to why [the] NHTSA has not

enacted side underride guard regulations would be wholly inadmissible as rank conjecture and

speculation, completely lacking any basis on sufficient facts or data and incapable of being the

11

product of reliable principles and methods." *Id.* at 11. In his 45-page Report, Mr. Bonanti details that he "served as the Associate Administrator of Rulemaking at the [NHTSA], a Senior Executive Service titled position." (Doc. 153-1) at 4. In this capacity, Mr. Bonanti "served as the senior executive for rulemaking to the automotive and commercial vehicle industries and led the development and oversight of all Federal Motor Vehicle Safety Standards ... crashworthiness and crash avoidance ... and the testing protocols required to comply with these regulations." *Id.* at 4.

Mr. Bonanti's experience with the NHTSA evidences that his opinion would exceed mere "rank conjecture and speculation." Indeed, his extensive experience and leadership within the NHTSA is illustrative of his knowledge on the agency's internal affairs, rulemaking criteria, and codification process. *See Kumho Tire Co.*, 526 U.S. at 150 (explaining that "relevant reliability concerns may focus upon personal knowledge or experience"). In addition, Ms. Hauck does not identify how Mr. Bonanti's opinions regarding the rulemaking process are erroneous, or otherwise unreliable. Mr. Bonanti cites extensively to NHTSA regulations, the "Large Truck Crash Causation Survey," and his industry experience to support his opinions, in both his Report and supporting affidavit. *See* (Doc. 163-1) at 4. Given his extensive credentials and detailed citations supporting his conclusions, the Court finds that Mr. Bonanti's opinions on internal rulemaking procedures are reliable. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2005) (opining that expert's "personal experience, training, method of observation, and deductive reasoning [were] sufficiently reliable to constitute 'scientifically valid' methodology").

Next, Ms. Hauck argues that Mr. Bonanti's opinion that the NHTSA does not utilize "computer model testing" is unreliable. (Doc. 153) at 16-17. At the outset, the Court notes that Mr. Bonanti's opinions referencing the need for "full scale testing to validate finite element

12

analysis completed on a computer" appear only in his criticism of Dr. Batzer's side-guard protector. *See* (Doc. 153-1) at 38-39. Therefore, having excluded Dr. Batzer's side-guard protector as unreliable, Ms. Hauck's objections on this point may now be moot. *See* (Doc. 173). However, to the extent that Mr. Bonanti still intends to offer testimony regarding the use of computer testing in a different capacity, the Court agrees with Ms. Hauck that this testimony is unreliable.

Principally, in his affidavit, Mr. Bonanti explained that, in 2011, the NHTSA allowed the National Truck Equipment Association "to test, utilize engineering analysis[,] or even computer simulation[,] to show they are in compliance with the regulations, due to the significant expense it would cause these very small manufacturers." (Doc. 163-1) at 11. This statement, that the NHTSA permitted computer model testing, casts doubt on Mr. Bonanti's conclusions that the "NHTSA does not consider computer modeling, even if it is finite element analysis, as an appropriate test method for compliance with the regulations" and "NHTSA wants to evaluate test data from actual repeatable full-scale testing to ensure compliance." *See* (Doc. 153-1) at 37. Indeed, NHTSA has allowed computer testing, as evidenced by Mr. Bonanti's affidavit and, thus, a full-scale repudiation of this method, as seen in Mr. Bonanti's Report, is an over-characterization of the NHTSA's position.

As a result, the Court concludes Mr. Bonanti's opinion that the NHTSA "does not consider computer modeling" is overbroad, and not based on the information he produced in his affidavit and submissions to the Court. *See Pioneer Centres Holding Co. Employee Stock Ownership Plan & Trust v. Alerus Financial, N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017) (explaining that "[w]hen expert opinion is not supported by sufficient facts … or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot

13

support a jury's verdict and will be excluded"). For this reason, the Court concludes that Mr. Bonanti's opinion on this matter is unreliable. Therefore, Mr. Bonanti is not permitted to proffer this conclusion before the jury.

Lastly, Ms. Hauck contends Mr. Bonanti's opinion that "installing side underride guards on semitrailers has the potential to place additional semitrailers onto U.S. highways and thereby increase accidents" is "pure conjecture and speculation, with absolutely no underlying basis or reliable methodology." (Doc. 153) at 18. Relatedly, Ms. Hauck argues that Mr. Bonanti's conclusion that adding side-guard protectors "impedes the utility of trailers" is unreliable. *Id.* at 20. In his Report, Mr. Bonanti opined that "installing heavy side underride guard systems to the bottom of semitrailers has the potential to place additional semitrailers onto U.S. highways and thereby increase accidents involving semitrailers." (Doc. 153-1) at 39. Several pages earlier, Mr. Bonanti reached the same conclusion, explaining that "[t]he increased weight of approximately 800 pounds for installation of the [side-guard protector] will result in a decreased load capacity of the semitrailers and require additional semitrailers be put on the road to transport the additional weight." *Id.* at 37. The Court agrees with Ms. Hauck that this *ipse dixit* of Mr. Bonanti alone, without any methodology, citation, or calculations in support, is likely unreliable. *See Norris*, 397 F.3d at 886 (explaining that court not required "to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

However, Mr. Bonanti subsequently submitted an affidavit, furthering explaining his calculations to support these conclusions. *See* (Doc. 163-1) at 10. Specifically, Mr. Bonanti explained the mathematical equation he employed to determine "the total freight that would be displaced by side underride guards." *Id.* Mr. Bonanti then calculated that 4,848 additional semitrailers "would need to [be] sold and placed on America's highways to transport the

14

displaced freight." *Id.* This accompanying calculus supplementing his Report is sufficient to demonstrate that Mr. Bonanti's opinion is reliable.

Nonetheless, Mr. Bonanti did not sufficiently tie this conclusion to his further opinion that the additional weight would "have the potential to increase accidents involving semitrailers." *Id.* Simply stated, the conclusion that "more trailers would lead to more accidents" is untethered to Mr. Bonanti's evidence and methodology in support—especially considering that the trailers would be hauling less cargo and, because of their side-guard protectors, would likely be safer for passenger vehicles. Mr. Bonanti did not explain the basis for this conclusion, in either his Report or affidavit, and he did not set forth the calculus he relied on in making this inferential opinion. Absent more than a bare conclusion without any evidence or calculations in support, Mr. Bonanti's opinion that "more trailers will lead to more accidents" is unreliable. *See* Fed. R. Evid. 702 (explaining that opinion must be "based on sufficient facts or data").

In conclusion, Mr. Bonanti's opinion regarding why side underride regulations do not exist is based on a reliable foundation and, therefore, is admissible. However, Mr. Bonanti's opinion that the NHTSA does not consider computer modeling is contradicted by the facts submitted in his subsequent affidavit. As a result, this opinion is unreliable and inadmissible under Federal Rule of Evidence 702. Finally, Mr. Bonanti's opinions that installing an underride protector would impede the utility of semitrailers and would increase the number of tractor-trailers on U.S. highways are supported by reliable methodology and calculations. These two opinions, therefore, are admissible. Nevertheless, Mr. Bonanti failed to explain the analytical gap between his calculations and his subsequent conclusion, that additional tractor-trailers would lead to more accidents. As a result, this final opinion is unreliable and inadmissible pursuant to *Daubert* and its progeny.

*2. Mr. Irwin's Opinions*

Next, in her Motion, Ms. Hauck challenges the reliability of Mr. Irwin's conclusions regarding:  (1) "the intersection and left turning traffic at the intersection" and whether this "would be in view from not less than 1000 feet away"; (2) the evidence extrapolated from his traffic study; and (3) whether if Wabash had a side underride protector installed, Ms. Chambers' vehicle would have still under-rode the trailer.  (Doc. 154) at 7-12.

Ms. Hauck first challenges the reliability of Mr. Irwin's conclusions regarding the visibility of the Wabash trailer.  (Doc. 154) at 7-8.  Specifically, Ms. Hauck contends that Mr. Irwin's conclusions are unreliable because his testing was conducted during the day, and the subject accident occurred at night.  *Id.*  In pertinent part, Mr. Irwin's Report details the photographs taken at the scene of the accident, skid and visibility testing, the police report, a traffic study, and laser scanner data, used to complete photographic analysis with a tool called Photo Modeler.  (Doc. 154-1) at 3-11.  From the photographic analysis and laser-scanner data, Mr. Irwin created a "scale accident diagram," and used "spreadsheet-based calculations" to calculate Ms. Chambers' speed at the time of the collision.  *Id.* at 12.  Mr. Irwin then utilized an Engineering Dynamics Corporation software program, known as SIMON, to produce computer simulations of the accident under different scenarios.  *Id.* at 12-13.

Relying on this data, Mr. Irwin proffered twenty-four conclusions.  *Id.* at 14-15.  In his Report, Mr. Irwin concluded that "there were no obstructions to visibility that would have affected Ms. Chambers' ability to see the tractor trailer."  (Doc. 154-1) at 14, ¶ 8.  Mr. Irwin explained in his deposition that his use of the word "obstruction" served to illustrate that "there's no piece of terrain or object for 1,000 feet, or maybe a little bit more, between [Ms. Chambers] and the tractor-trailer."  (Doc. 154-2) at 3, ¶¶ 13-21.

Mr. Irwin's conclusion is consistent with the photographs and recorded descriptions of the scene. Indeed, nothing physically "obstructs" the view between the Wabash trailer and Ms. Chambers' vehicle. Mr. Irwin's use of the term "obstruction," as explained in his deposition, is consistent with the common usage of the term. *See* Merriam-Webster's Dictionary, *Obstruct*, https://www.merriam-webster.com/dictionary /obstruct (last visited Feb. 24, 2021) (defining "obstruct" as "interfering with something in motion or in progress by the sometimes intentional placing of obstacles in the way"). An "obstruction" relates to a physical obstacle in the road, "blocking" or "interfering with" Ms. Chambers' view of the Wabash trailer. Thus, to argue that "light," or the lack thereof, "obstructs" someone's view ignores the plain language understanding of the term "obstruct," and Mr. Irwin's accompanying explanation.

To the extent that Ms. Hauck contends darkness "obstructed" Ms. Chambers' view of the Wabash trailer, she is free to cross-examine Mr. Irwin on how light conditions impact visibility. *See Daubert*, 509 U.S. at 596 (explaining that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). Beyond this, however, the light conditions at the time of the accident do not render the Report's conclusions or testing methods unreliable. The Court also notes that Mr. Irwin's opinions regarding the visibility of the trailer are supported by ample scientific data, including computer analysis and testing that Ms. Hauck does not contend are unreliable. *See e.g.*, (Doc. 154-1) at 9 (explaining that "Photo Modeler is a commercially available software tool that is routinely used in the analysis of photographs and in the analysis of motor vehicle accidents"); *id.* at 10 (explaining that "methodology associated with the [Damage Index Matrix] and [] speed analysis that uses [it] is described in [scientific research] paper"); *id.* at 12 (explaining that "SIMON is a commercially available computer simulation

17

software tool intended for use in the analysis of motor vehicle accidents"). As a result, Mr.
Irwin's opinion regarding the visibility of the Wabash trailer at the intersection is reliable under
Federal Rule of Evidence 702.

Next, Ms. Hauck contends that Mr. Irwin's traffic study is unreliable, because it is based
on the recorded speed of only eight vehicles driving through the accident scene. (Doc. 154) at 8-
9. Undisputedly, Mr. Irwin's traffic study is based, in part, on the recorded speed of vehicles that
he documented during his investigation. However, Mr. Irwin's conclusions rely on significantly
more than just the speed of the vehicles he documented at the accident site.

Indeed, Mr. Irwin also studied the accident photographs and the skid marks from Ms.
Chambers' vehicle, to corroborate his evidence from the traffic study. (Doc. 154-1) at 8-11. Mr.
Irwin then created a "scale accident scene diagram," and used "laser scanner data collected at the
scene during the inspection" to complete a "photographic analysis of the [] photographs taken on
the night of the accident." *Id.* at 9. Mr. Irwin superimposed the photographs and the laser
scanner data using "Photo Modeler" software. *Id.* In addition, Mr. Irwin created a "Damage
Index Matrix," a "grid-style matrix that can be overlaid on top of a damaged vehicle that has
experienced an underride crash event." *Id.* at 10. Based on this testing and data, "spreadsheet-
based calculations," and "computer simulation analysis," Mr. Irwin opined on the "average rates
of deceleration that the vehicle would experience." *Id.* at 12. Mr. Irwin relied on these
calculations and testing results to reach his conclusion.

The Court disagrees with Ms. Hauck's contention that Mr. Irwin's opinion "is based upon
a total of only 8 vehicles during daytime conditions." (Doc. 154) at 10. Rather, Mr. Irwin's
conclusion utilizes the evidence of vehicle speed during his investigation in conjunction with
several other objective testing measures. *See* (Doc. 154-1) at 8-12. In this way, Mr. Irwin's

traffic study is one of several methodologies utilized to support his conclusion, and it

corroborates his other testing and data analyses.  For these reasons, the Court concludes that Mr.

Irwin's traffic study, in conjunction with the other methodology detailed in his Report, is

reliable.  Therefore, Mr. Irwin's opinion regarding the traffic study is admissible.

Finally, Ms. Hauck asserts that Mr. Irwin's opinion that "a vehicle impacting a side

underride guard at an angle similar to the subject accident would deform the guard, resulting in

the vehicle under-riding the trailer." (Doc. 154) at 10.  In reaching this conclusion, Mr. Irwin

studied Mr. Ponder's "Angel Wing" design, previously found unreliable by this Court.  *Id.* at 11-

12.  Thus, having determined that Mr. Ponder's Angel Wing is unreliable, Mr. Irwin may not

rely on this design to support his conclusions.  *See* (Doc. 173).  As a result, the opinions Mr.

Irwin proffers that rely on the Angel Wing are inadmissible under Rule 702.

Notwithstanding this conclusion, the remainder of Mr. Irwin's reconstruction opinions

that do not rely on his testing of the Angel Wing are reliable.  In reaching his conclusions, Mr.

Irwin explained in detail the analyses that he performed leading to each of his opinions.  *See*

(Doc. 154-1) at 6-13.  As previously described, Mr. Irwin used several different measures to

ensure the accuracy of his Report, including computer simulations, spreadsheet-based

calculations, laser scanner diagrams, scale accident scene diagrams, and investigation of the

accident scene.  *Id.*  The Court is satisfied that Mr. Irwin's opinions, extrapolated from several

different industry-recognized methods of analyses and testing, are reliable.

In conclusion, Mr. Irwin's analysis and opinions regarding the visibility of the Wabash

trailer, and the traffic study he conducted during his investigation, are based on reliable facts and

data.  As a result, the Court denies Ms. Hauck's request to exclude these opinions.  However,

because some of Mr. Irwin's reconstruction opinions are based on evidence that this Court

previously found unreliable, these opinions are inadmissible.  The remainder of Mr. Irwin's Report, including his accident reconstruction that does not rely on the Angel Wing's analyses, remains admissible.

### 3. Dr. Reinhart's Opinions

Lastly, Ms. Hauck requests exclusion of Dr. Reinhart's opinion that "Ms. Chambers would have sustained a life-threatening or permanently debilitating head injury if the trailer had been equipped with a side underride guard[.]"  (Doc. 155) at 2.  Specifically, Ms. Hauck argues that Dr. Reinhart's opinions, citing Mr. Irwin's Report, are unreliable because "he [] never personally reviewed the computer simulation done by Mr. Irwin."  *Id.* at 9.  In addition, Ms. Hauck asserts that Dr. Reinhart's opinions "are based upon potential, not any form of probability."  *Id.* at 8.

 In his Report, Dr. Reinhart presented a detailed summary of Ms. Chambers' medical history following the accident.  (Doc. 155-1) at 3-8.  In addition, Dr. Reinhart reviewed photographs from the accident, and the "accident reconstruction" detailed in Mr. Irwin's Report. *Id.* at 9-13.  As a preliminary matter, and as detailed above, Dr. Reinhart may not rely on testing from Mr. Ponder's Angel Wing because this design has been deemed unreliable by the Court. *See* (Doc. 173).

In response to Ms. Hauck's Motion, Wabash asserts that "Dr. Reinhart's opinion is offered to demonstrate that [Ms. Hauck's] experts have not fully considered how the presence of a [side-guard protector] on the trailer may have affected the outcome of the accident."  (Doc. 162) at 6.  In proffering this argument, Wabash cites exclusively to case law explaining that a defendant's expert may produce testimony to cast doubt on a plaintiff's theory of the case.  *Id.* at 5. Wabash is correct:  a defendant may produce a rebuttal expert to "poke holes" in a plaintiff's

purported theory of causation.  However, even if the evidence serves as a rebuttal, it still must

conform with *Daubert*'s requirements for admissibility.

 The Court first notes the important limits identified in Dr. Reinhart's five stated opinions,

identified by Ms. Hauck.  Dr. Reinhart does not render conclusions about, and he is not permitted

to testify regarding, the extent Ms. Chambers would have sustained injuries if a side-guard

protector was installed.  Indeed, Dr. Reinhart's Report, and Wabash's Response defending the

Report, are focused solely on rebutting Ms. Hauck's contention that a feasible alternative design

existed that would have prevented Ms. Chambers' injuries.  *See* (Doc. 155-1) at 20 (concluding

that Ms. Hauck "has not established that Ms. Chambers' would not have sustained a 'life-

threatening or permanently debilitating' head injury in the presence of a trailer side underride

guard within the context of the subject collision's conditions").

 As a result, Dr. Reinhart may only testify regarding the weaknesses he identified in Ms.

Hauck's theory for an alternative design that could have prevented Ms. Chambers' injuries.

Anything beyond that scope is plainly outside the contours of what he contemplated in his

Report.  Indeed, Dr. Reinhart does not proffer any of his own conclusions, he merely criticizes

the weaknesses apparent in the other experts' Reports.  This is permissible, so long as it stays

within the boundaries he identifies and is supported with reliable scientific data.

 Notwithstanding these limitations, the Court is satisfied that Dr. Reinhart's conclusions

are supported by reliable scientific data and methodology.  Principally, Dr. Reinhart cites both

Mr. Irwin's accident reconstruction Report, and the Report authored by Ms. Hauck's expert.

(Doc. 155-1) at 12.  In addition, Dr. Reinhart explains the biomechanics and kinematics of Ms.

Chambers' collision, detailing the severe injuries Ms. Chambers' sustained because of the

accident.  *Id.* at 13-15.  Dr. Reinhart supports his conclusions by examining, and extrapolating

data from, both Ms. Hauck's expert reports and Mr. Irwin's study. *Id.* at 15-18. In short, it is apparent that Dr. Reinhart's Report is based on rigorous examination of the accident details, including both parties' own expert findings and conclusions.

In arguing that Dr. Reinhart's Report fails to satisfy *Daubert* standards for admissibility, Ms. Hauck contends that Dr. Reinhart did not personally review the accident reconstruction data supporting Mr. Irwin's Report. (Doc. 155) at 9. Dr. Reinhart's Report clearly evidences that he reviewed Mr. Irwin's conclusions, including several other pertinent details and findings. *See* (Doc. 155-1) at 2, 12, 15, 18, 19, 20. This includes, for example, comparing Mr. Irwin's Report with the opinions proffered by Ms. Hauck's expert, and citing his conclusions throughout his analysis of the data. *Id.* at 12, 18. From Mr. Reinhart's detailed summary of Mr. Irwin's Report, and his repeated reliance on Mr. Irwin's data to proffer his own conclusions, the Court is satisfied that he sufficiently studied and contemplated Mr. Irwin's materials.

Second, the Court disagrees with Ms. Hauck's contention that Dr. Reinhart's opinions are based on mere "potential" rather than "probability." (Doc. 155) at 8. Principally, Dr. Reinhart explains that he "arrived at [his] opinions based upon a reasonable degree of medical and engineering probability[.]" (Doc. 155-1) at 18. Moreover, Dr. Reinhart's Report uses the terms "potential" and "potentially" on three occasions, none of which are in his final opinions. *See id.* at 14, 18. Instead, for example, Dr. Reinhart uses the term "potentially" to describe the injuries Ms. Chambers may have sustained if a side-guard was installed on the trailer at the time of the collision. *Id.* at 18.

Dr. Reinhart's qualifying of his alternate conclusion is appropriate because he later explains that, with this "potential" for injury outstanding, it is his opinion "based on a reasonable degree of medical and engineering probability," that Ms. Chambers may still have sustained

serious and life threatening injuries even with a side-guard protector installed.  *See id.*  In this way, the use of his term "potentially" strengthens his conclusion, rather than weakens it, as Ms. Hauck suggests.  Indeed, with an outstanding potential for injury even after the installation of side-guard protectors, Dr. Reinhart concludes that Ms. Hauck has not demonstrated that Ms. Chambers would have survived the accident.

In short, Dr. Reinhart's conclusion is based on reasonable probability, and nothing he suggested in his deposition or cited in his Report detracts from that conclusion.  His Report relies on the "vehicle's type of side airbag…, kinematic motion of [Ms. Chambers'] head and body…, clockwise yawing of her vehicle…, partial underriding of her vehicle under the trailer, and the location of the trailer's lower frame rail located in close proximity to the driver's side window and Ms. Chamber's head."  *Id.* at 19-20.  Moreover, Dr. Reinhart's use of the term "potentially" serves to illustrate his contention that Ms. Hauck has not proven that Ms. Chambers could have survived the accident even with the installation of a side-guard protector.  As a result, the Court is not persuaded by Ms. Hauck's contention that Dr. Reinhart's use of the term "potentially" weakens the reliability of his conclusions.

In conclusion, Dr. Reinhart may not rely on the Angel Wing design to opine on any possible injuries Ms. Chambers may have sustained even with its installation.  *See* (Doc. 173). In addition, Wabash may only elicit testimony from Dr. Reinhart in the context of a rebuttal, because its response to Ms. Hauck's Motion fails to support any additional use or the Report's reliability outside this context.  Finally, within the limited scope that Dr. Reinhart is expected to testify, his Report clearly evidences that his methodology and conclusions are based on reliable scientific data.

*IV.*     *Conclusion*

In conclusion, the Court grants in part and denies in part Ms. Hauck's Motion to Exclude Christopher Bonanti (Doc. 153), grants in part and denies in part the Motion to Exclude Andrew Irwin (Doc. 154), and grants in part and denies in part the Motion to Exclude Lars Reinhart (Doc. 155). For purposes of detailing the expert's testimony admissible at trial, the Court delineates its above conclusions.

IT IS THEREFORE ORDERED that:

1. The following opinions proffered by Mr. Bonanti are inadmissible under Federal Rules of Evidence 403 and 702, for the reasons explained above:

    a.  NHTSA's standards for "defective" or "not defective" products;

    b.  The "economic and technological feasibility" of side-guard protectors;

    c.  NHTSA's consideration of computer-model testing; and

    d.  That additional tractor-trailers on U.S. highways would lead to more accidents;

2. Wabash must narrowly tailor the testimony it elicits from Mr. Bonanti regarding the history of NHTSA regulations and its current rule-making criteria;

3. Mr. Irwin may not testify about, or rely on data extrapolated from, Mr. Ponder's Angel Wing design;

4. Dr. Reinhart may not testify about, or rely on data extrapolated from, Mr. Ponder's Angel Wing design; and

5. Dr. Reinhart's testimony must be limited to the scope and use identified in Wabash's Response.

In all other respects, the Court denies Ms. Hauck's Motions, for the reasoning explained above.

IT IS ORDERED.

UNITED STATES DISTRICT JUDGE