IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LINDA HAUCK, *as personal*
*representative of the Estate of*
*Deborah A. Chambers,*

     Plaintiff,

vs.                                No. CV 18-471 KG/LF

WABASH NATIONAL CORPORATION,

     Defendant.

MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Wabash National Corporation's (Wabash) Motion in Limine (Motion) (Doc. 156). The Motion is now fully and timely briefed. *See* (Docs. 159, 164). The Court notes jurisdiction under 28 U.S.C. § 1332. After review of the parties' briefing and the relevant law, the Court grants in part and denies in part Wabash's Motion in Limine (Doc. 156).

*I.*    *Background & Procedural Posture*

Deborah Chambers was fatally injured after her vehicle under-rode the side of a Wabash tractor-trailer. (Doc. 159) at 1. Plaintiff Linda Hauck, as personal representative, filed the instant action in the First Judicial District Court of New Mexico. (Doc. 1). On May 21, 2018, Wabash removed the case to this Court. *Id.* The parties subsequently engaged in extensive motions practice, litigating the proper scope, evidence, and claims for the Court to consider. *See, e.g.,* (Docs. 32, 33, 34, 36, 39, 66, 77, 88, 90, 91, 92, 109, 113, 136, 137, 150). Wabash's current Motion requests relief previously addressed elsewhere in the parties' pretrial motions and the Court's prior Orders. As a result, the Court briefly summarizes the relevant procedural posture.

In July 2018, this case was set on a complex discovery track. (Doc. 22) at 1. Nearly a year later, this Court entered its first of several Memorandum Opinion and Orders (Doc. 104), holding in abeyance Wabash's Motion to Dismiss (Doc. 34) and first request for summary judgment (Doc. 90). (Doc. 104) at 1-3. On January 22, 2020, this Court entered its second Memorandum Opinion and Order (Doc. 117), granting Wabash summary judgment on Ms. Hauck's claims for negligence and strict products liability based on a model year 2000 Wabash tractor-trailer. (Doc. 117) at 11; (Doc. 118). Over Wabash's objection, the Court granted Ms. Hauck leave to amend her Complaint, permitting her to allege that the subject accident involved a model year 2004 Wabash tractor-trailer. *See* (Docs. 119, 121).

Subsequently, the Court granted in part and denied in part Wabash's Motion to Exclude Expert Testimony (Doc. 136) and Motion for Summary Judgment (Doc. 137). (Docs. 173, 174). In pertinent part, the Court concluded that Ms. Hauck's engineering experts, Perry Ponder and Dr. Stephen Batzer, could not rely on their design prototypes to opine that an economically and technologically feasible alternative design existed. (Doc. 173). Moreover, the Court denied Wabash's second request for summary judgment on Ms. Hauck's claims for strict products liability, negligence, and punitive damages. (Doc. 174) at 13-14. In its holding, the Court concluded that Ms. Hauck raised colorable claims against Wabash based on the absence of side underride protection for its model year 2004 tractor-trailer. *Id.* However, the Court noted that because Ivy Chambers failed to participate in discovery, Ms. Hauck could not argue for a jury award that includes a calculation of her damages. *Id.* at 14.

Finally, and most recently, the Court granted in part and denied in part Ms. Hauck's Motions to Exclude Wabash's Expert Testimony (Docs. 153, 154, 155). (Doc. 175). After extensive review of the experts' reports and the data collected, the Court restricted the proposed

2

testimony of Andrew Irwin, Christopher Bonanti, and Dr. Lars Reinhart, pursuant to the Federal

Rules of Evidence and the principles commanded by *Daubert* and its progeny. *See id.* Two

motions now remain pending before the Court. *See* (Docs. 156, 157).

II.     *Discussion*

Presently before the Court is Wabash's omnibus Motion, arguing for exclusion of several

types of evidence. (Doc. 156). Specifically, Wabash requests a pretrial ruling on the

admissibility of evidence and testimony regarding: (1) Mr. Ponder's Angel Wing design; (2) Ivy

Chambers' damages; (3) "any cost-benefit analysis" to measure Ms. Chambers' life; (4) its

wealth; (5) its lobbying efforts; (6) "dissimilar" crash testing; (7) its "proof of concept" side

underride design; (8) other unconstructed designs; (9) designs that post-date the manufacture of

the trailer at issue; (10) a statement made by the Truck Trailer Manufacturers Association

President; (11) Ms. Hauck's accident reconstructionist; (12) the "wall of light" testimony; and

(13) the report of the Government Accountability Office. *Id.* at 2-21. Ms. Hauck opposes

Wabash's requests for relief. (Doc. 159). As a result, the Court addresses each of Wabash's

requests in turn.

A.     *Angel Wing Design*

First, Wabash contends that "[e]vidence regarding [the] Angel Wing [design] is []

irrelevant because it cannot reasonably be held out as a feasible alternative design." (Doc. 156)

at 8. In response, Ms. Hauck explains that Wabash already raised this argument in its prior

Motion to Exclude. (Doc. 159) at 2, 7. The Court agrees with Ms. Hauck.

Specifically, this Court already opined that Mr. Ponder's Angel Wing design is unreliable

and inadmissible under the Federal Rules of Evidence. *See* (Doc. 173) at 20 (concluding that

"Mr. Ponder's expert opinion[] that an economically and technologically feasible alternative

design existed to prevent vehicle under-riding [is] not reliable and, thus, inadmissible under Federal Rule of Evidence 702"). As a result, Wabash's current request, arguing for the same relief already granted, is denied as moot.

### B. Evidence of Ivy Chambers' Damages

Second, Wabash contends that "[b]ecause Ivy [Chambers] opted not to participate in discovery, she is in no position to offer evidence at trial." (Doc. 156) at 12. In response, Ms. Hauck asserts that "[t]his baseless argument was fully briefed in [Ms. Hauck's] response to Wabash's summary judgment motion...." (Doc. 159) at 10. The Court again agrees with Ms. Hauck.

Indeed, this Court previously explained that it possesses no authority to delineate how Ms. Chambers' estate distributes its assets. (Doc. 174) at 12. Nonetheless, the Court opined, "[a]s a sanction for her failure to participate in discovery, and her refusal to be deposed, Ms. Hauck [is restricted] from presenting evidence on the damages Ivy Chambers sustained because of Ms. Chambers' death." Id. at 13. Thus, Wabash's current request, arguing for the same relief already awarded in this Court's prior Order (Doc. 174), is denied as moot.

### C. Evidence of Cost-Benefit Analysis

Third, Wabash argues that Ms. Hauck should be prohibited from presenting evidence of the "cost-per-life-saved" metric authored by a former National Highway Traffic Safety Administration (NHTSA) official. (Doc. 156) at 13. Principally, Wabash asserts that this calculus is irrelevant to Ms. Hauck's damage assessment to ascertain the value of Ms. Chambers' life. Id. In response, Ms. Hauck explains that she "does not intend to use the historical cost-benefit analysis of side impact guards conducted by the NHTSA to determine the value of Ms. Chambers' life." (Doc. 159) at 11.

Absent objection from Ms. Hauck, the Court grants Wabash's request to exclude testimony of the "cost-per-life-saved" metric as it applies to the value of Ms. Chambers' life. However, to the extent Ms. Hauck attempts to utilize this metric "with other issues in this case unrelated to the calculation or valuation of … Ms. Chambers' life," that evidence remains uncontested and, thus, admissible.  In all other respects, Wabash's request is granted without objection.

### D.  Evidence of Wabash's Wealth

Next, Wabash argues that "any evidence regarding [its] wealth or revenue should be excluded, as such evidence is only admissible in cases in which punitive damages are in issue." (Doc. 156) at 5.  In response, Ms. Hauck explains that she "has a submissible punitive damages case," as asserted in her prior response to Wabash's Motion for Summary Judgment.  (Doc. 159) at 4.  As a result, Ms. Hauck contends that evidence of Wabash's wealth is relevant and admissible.  *Id.*  The Court agrees with Ms. Hauck.

In pertinent part, this Court previously opined that "summary judgment on the issue of punitive damages is not appropriate because, given the undisputed material facts, a reasonable jury could … conclude that Wabash's refusal to install side-guard protectors was, at a minimum, reckless."  (Doc. 174) at 12.  Therefore, having determined that Ms. Hauck's claim for punitive damages may proceed before the jury, the Court finds that evidence of Wabash's wealth is properly admissible.  *See Leon v. FedEx Ground Package Sys., Inc.*, 313 F.R.D. 615, 637 (D.N.M. 2016) (Browning, J.) (collecting cases) (concluding that "defendant's wealth is relevant to the determination of punitive damages"); *see also Ruiz v. Southern Pac. Transp. Co.*, 1981-NMCA-094, ¶ 32, 97 N.M. 194 (explaining that "New Mexico has adopted the general rule admitting evidence of a defendant's wealth for purposes of fixing the amount of punitive

damages, if awarded"). On this basis, Wabash's request to exclude evidence of its wealth is denied.

### E.  Evidence of Lobbying Efforts

Next, Wabash requests that this Court preclude Mr. Ponder from testifying on the tractor-trailer industry's efforts to lobby against regulations promoting the use of side-guard protectors. (Doc. 156) at 2. In support, Wabash asserts that Mr. Ponder "did not include anything about [this] in any of his reports, and [his testimony] should be excluded on this basis…." *Id.* Moreover, Wabash argues that Mr. Ponder's testimony is "not relevant to either of the claims that are in issue," and to the extent it is relevant, its inclusion is unduly prejudicial. *Id.* at 3. Finally, Wabash asserts that this evidence is protected under the Petition Clause of the First Amendment. *Id.*

Mr. Ponder discussed Wabash's lobbying efforts in his rebuttal report, authored on June 17, 2020. (Doc. 156-1) at 3. Subsequently, at his deposition on July 1, 2020, Mr. Ponder was asked to elaborate on the opinions proffered in his report. (Doc. 156-2) at 3-5. When asked by defense counsel if he wanted to share "anything specific to Wabash that [he had] in mind with respect to lobbying against side underride protection," Mr. Ponder alluded to additional documents he found the night before. *Id.* at 4-5. Mr. Ponder explained that he did not include the newly discovered evidence with his previously disclosed materials, nor did he mention it in his prior reports. *Id.* at 5.

Ms. Hauck does not contest these facts but, instead, she argues that Wabash "placed its lobbying efforts … at issue through its defense in this case, thereby opening the door to Mr. Ponder's testimony on lobbying." (Doc. 159) at 2. Specifically, Ms. Hauck asserts that Wabash's expert, Christopher Bonanti, is expected to opine about the "lack of [side underride]

6

regulations," and "the supposed reasoning behind the lack of regulation[s]." *Id.* at 3.  Therefore, she claims, "fundamental fairness requires that [Ms. Hauck] be allowed to rebut such evidence and argument," through Mr. Ponder's testimony. *Id.*

Nevertheless, Ms. Hauck does not explain why Mr. Ponder did not disclose this information earlier—for instance, in his rebuttal report.  *See* (Doc. 156-1) at 2 (Mr. Ponder's rebuttal report, noting receipt of Mr. Bonanti's reports); *see also* Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi) (explaining expert disclosure requirements for report materials).  In addition, the record is void of any indication that this evidence could not have been previously discovered and disclosed.  *See, e.g.*, (Doc. 156-2) at 4-6 (noting that newly introduced evidence consisted of lobbying reports from 2015 and 2017).  Absent any reasoning or rationale advanced to justify Mr. Ponder's untimely disclosure, this mid-deposition reveal unfairly prejudices Wabash.  Specifically, by the time Mr. Ponder produced these additional materials, the experts had already engaged in rigorous study, numerous exchanges of reports, and lengthy deposition questioning.  Thus, Wabash did not have adequate time to investigate this material, have its own experts study it, or prepare its case in response.

Notwithstanding this conclusion, the Court notes that a party may introduce impeachment evidence for the first time during a deposition.  *See* Fed. R. Civ. Pro. 26(a)(1)(A)(ii) (explaining disclosure requirements for impeachment evidence).  Thus, consistent with the Federal Rules of Civil Procedure, Ms. Hauck may offer this evidence at trial to impeach Wabash's witnesses or experts.  *See id.*  Otherwise, the reports remain inadmissible because of their untimely disclosure.

The other information about lobbying that was properly disclosed in Mr. Ponder's reports, however, is admissible.  Specifically, Mr. Ponder properly disclosed that he would discuss Wabash's agreement with other industry partners and the expense reports it submitted to

the federal government. *See e.g.*, (Doc. 156-1) at 3.  In addition, Wabash has repeatedly argued

that the lack of industry regulations on side underride protection plainly shield it from civil

liability.  *See* (Doc. 137) at 13; (Doc. 174) at 10 (rejecting Wabash's argument that "because no

trailer manufacturers currently utilize side-guard protectors, its current design cannot be

considered unreasonably dangerous").  Therefore, evidence that Wabash played a part in crafting

these regulations is plainly relevant under its own theory of the case.

Moreover, Wabash's reliance on the Petition Clause of the First Amendment to exclude

this evidence is without merit.  In two related cases in the 1960s, the United States Supreme

Court crafted the Noerr-Pennington doctrine, explaining that individuals and corporations that

petition the government cannot be held liable for antitrust violations if their lobbying activity

adversely impacts their competitors.  *See Eastern R.R. Presidents Conf. v. Noerr Motor Freight,*

*Inc.*, 365 U.S. 127, 136 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670

(1965).  Since the doctrine's initial inception, it has been extended outside the antitrust context to

apply to other "common law torts."  *Scott v. Hern*, 216 F.3d 897, 914 (10th Cir. 2000) (collecting

cases).  The pertinent question for a court to consider in assessing the doctrine's applicability is

whether the imposition of liability would "infringe or chill [the defendant's] right to petition...."

*Id.*

This Court need not look beyond the *Pennington* decision to determine that the doctrine

is inapplicable here.  Specifically, in *Pennington*, the Supreme Court explained that even if

evidence of lobbying is "for some reason [] barred from forming the basis of a suit, [it] may

nevertheless be introduced if it tends reasonably to show the purpose and character of the

particular transactions under scrutiny."  *Pennington*, 381 U.S. at 670, n.3.  In accord with

*Pennington*'s mandate, "courts have invoked the doctrine only where the cause of action itself is

8

based on the act of lobbying or filing a lawsuit." *Mason v. Texaco, Inc.*, 741 F.Supp. 1472, 1500 (D. Kan. 1990) (collecting cases); *see also In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 789 (7th Cir. 1999) (explaining that district judge "erred in treating the doctrine as a rule of evidence that forbids the introduction of evidence … relating to efforts to obtain governmental protection"); *In re Tylenol (Acetaminophen) Marketing, Sales Practices & Products Liability Litigation*, 181 F.Supp. 3d 278, 306 (E.D. Pa. 2016) (concluding that "[i]t would be a stretch to say that Noerr-Pennington bars any use of any evidence of the defendants' petitioning of the government").

As a result, the Court concludes that the Noerr-Pennington doctrine does not apply to exclude evidence of Wabash's lobbying efforts.  Most importantly, here, Ms. Hauck does not allege a cause of action for civil conspiracy, or otherwise assert a claim based on Wabash's lobbying efforts.  For these reasons, the Court rejects Wabash's argument to exclude this evidence from admission.

In summary, Mr. Ponder may not testify about, and Ms. Hauck may not seek to introduce, the lobbying reports provided to Wabash for the first time during Mr. Ponder's deposition. These documents were not properly disclosed, and Ms. Hauck failed to indicate why they should nonetheless be admitted.  Consistent with the Federal Rules of Civil Procedure, this evidence may only be used for impeachment purposes.  However, Ms. Hauck may elicit testimony from Mr. Ponder on the other information regarding lobbying that he properly disclosed in his reports. Notwithstanding this conclusion, the Court will not permit what may amount to a "trial within a trial" or for Ms. Hauck to establish the lengths at which Wabash engaged in lobbying activity. While this information is relevant, timely, and not barred by the Petition Clause of the First Amendment, its introduction still must comport with Rule 403, specifically, that it does not

9

waste time or needlessly result in the presentation of cumulative evidence.  Resultingly, Wabash's objection on this point is granted in part and denied in part.

    *F.   Dissimilar Crash Testing*

Next, Wabash contends the vehicle crash testing that Ms. Hauck's experts relied on in proffering their opinions present materially different circumstances than the accident at issue. (Doc. 156) at 6-7.  For example, Wabash explains that one test used a "completely different type of trailer," and others used a "2012 Hyundai Elantra, a 1994 Nissan Sentra, and a 1993 Chevrolet Beretta."  *Id.* at 7.  Given these stark dissimilarities, Wabash contends the tests are unreliable and should be excluded from the jury's purview.  *Id.*

In response, Ms. Hauck alleges that the tests serve to "merely illustrate[] principles used to form an expert opinion."  (Doc. 159) at 5 (quoting *Gilbert v. Cosco, Inc.*, 989 F.2d 399, 402 (10th Cir. 1993)).  Indeed, Ms. Hauck argues, her experts "are not offering or utilizing these crash tests to recreate the subject accident."  *Id.*  Rather, the experts rely on these tests to illustrate principles of "vehicle dynamics, vehicle performance[,] and occupant kinematics in collisions between passenger vehicles and trailers equipped with underride protection devices."  *Id.*  Therefore, she contends that because the testing is used as an illustrative tool rather than proof of the accident's conditions, it need not mirror Ms. Chambers' collision.  *Id.*

The general rule is that "experiments which purport to recreate an accident must be conducted under conditions similar to that accident, while experiments which demonstrate general principles used in forming an expert's opinion are not required to adhere strictly to the conditions of the accident."  *Gilbert*, 989 F.2d at 402.  In this way, courts distinguish between an expert's "demonstration" and their "recreation," the former of which may only be used to "demonstrate the basic principles underlying [the expert's] opinion."  *Pandit v. American Honda*

*Motor Co., Inc.*, 82 F.3d 376, 382 (10th Cir. 1996).  Moreover, "when experiments do not simulate the actual events at issue, the jury should be instructed that the evidence is admitted for a limited purpose or purposes." *Gilbert*, 989 F.2d at 402 (citing *Robinson v. Audi NSU Auto Union Aktiengesellschaft*, 739 F.2d 1481, 1484 (10th Cir. 1984)); *see also Pandit*, 82 F.3d at 382 (explaining that jury must be "informed the experiments were merely demonstrative").

       Here, Mr. Lewis' expert opinion goes beyond "demonstrating basic principles" related to side underride protectors.[1]  Instead, Mr. Lewis uses the dissimilar crash models to support his conclusion that "Ms. Chambers would have survived the accident" if an underride guard were installed on the tractor-trailer.  (Doc. 164-2) at 32-34; *see also* (Doc. 164-3) at 4 (explaining that "[h]ad there been a side underride guard that performed like the one in this test … Ms. Chambers could still be alive today").  In addition, Mr. Lewis explicitly compared the underride rate of Ms. Chambers' vehicle with the underride rates of the test vehicles equipped with side-protectors. (Doc. 164-2) at 34; *see also* (Doc. 164-3) at 6 (explaining that "testing I have referenced[] serves to invalidate the defense's contention … that … [Ms. Chambers] will still get significant head injuries").  Lastly, Mr. Lewis compared Ms. Chambers' impact speed after initiating her emergency braking with that endorsed during the crash testing.  (Doc. 164-2) at 34.

       These opinions illustrate that Mr. Lewis went beyond merely demonstrating the relevant concepts with the use of the test vehicles.  Rather, he directly contrasted the tests with Ms. Chambers' collision—an inferential exercise he may only present before the jury if the experiments and the accident occurred under similar circumstances.  Because he does not allege that such conditions existed, this evidence is inadmissible as an accident "reconstruction."

---

     1. The Court notes that while Wabash claims Ms. Hauck's experts relied on dissimilar crash testing, it proceeded to analyze only one expert's opinion, that of Mr. Lewis. *See* (Doc. 156) at 7.

Notwithstanding this conclusion, the dissimilar testing may still be used if tailored to fit within its proper scope, to illustrate Mr. Lewis' opinions.  If Ms. Hauck utilizes this evidence before the jury, she must carefully elicit Mr. Lewis' testimony for the narrow purpose of demonstrating his opinions, rather than recreating the accident.  Anything beyond this purpose is inconsistent with the Federal Rules of Evidence and *Daubert* standards of reliability.  In addition, if Mr. Lewis references the accident demonstration during his testimony, Ms. Hauck must submit a jury instruction that explains the proper use and scope of this evidence.  *See Gilbert*, 989 F.2d at 402 (explaining jury should be instructed on proper use of demonstration evidence).  Wabash's objection on this evidence, therefore, is granted in part and denied in part.

### G.  *Proof of Concept Design*

Next, Wabash argues that its "proof of concept" side underride protector cannot be admitted to support Ms. Hauck's contention that a feasible alternative design existed.  (Doc. 156) at 8.  In support, Wabash asserts that this design cannot prevent underride collisions because it is not commercially available for purchase or production.  *Id.*  In response, Ms. Hauck asserts that Wabash's underride protector "has been physically built, displayed at a commercial vehicle show[,] and crash tested."  (Doc. 159) at 6.  Moreover, Ms. Hauck contends that "each component that makes up the [underride protector] was available at the time the subject trailer was manufactured, and Wabash has demonstrated its ability to equip its trailers with these guards."  *Id.* at 6-7.

This Court outlined the standard of admissibility for feasible alternative designs in its prior Memorandum Opinion and Order.  (Doc. 173).  In its Order, the Court opined that "the side-guard attachment for tractor-trailers remains a relatively new concept, not widely used in the industry, and complicated in design."  *Id.* at 14.  Furthermore, the Court explained that "merely

12

because the materials existed to craft these products," does not demonstrate that a "logical nexus [exists] to conclude that such a device was technologically feasible." *Id.* at 16.

Like Mr. Ponder's design, Wabash's prototype suffers from the same "lack of market availability" and "limited real-life consumer crash testing." *Id.* at 13. Principally, the design is not available for purchase and has collected limited crash-worthiness data from use on the road. Instead, like the unconstructed and limited-use designs crafted by Dr. Batzer and Mr. Ponder, Wabash's design prototype fails admissibility and reliability standards as required by *Daubert.* *See id.* at 9 (explaining *Daubert* standard for admissibility of scientific evidence). For these reasons, and the reasons further explained in this Court's prior Memorandum Opinion and Order, Wabash's side underride protector may not be proffered as a feasible alternative design to support Ms. Hauck's products liability claim. *See* (Doc. 173).

### H. Evidence of Unconstructed Designs

Next, Wabash argues for exclusion of "evidence regarding alternative designs that have not been constructed." (Doc. 156) at 9. In support, Wabash contends that Ms. Hauck relies on "designs [that] exist only in patent applications and conceptual design drawings" which have not "been tested aside from computer simulations and calculations." *Id.* In crafting this argument, Wabash does not indicate which designs it is referring to, or what specific evidence it seeks to exclude. *See id.* Instead, Wabash's contention appears as a "catch-all" argument, attempting to exclude all "other" evidence of alternative designs Ms. Hauck may proffer.

The Court is strained to accept a generalized or blanket assertion that all "other designs" must be excluded from the jury's purview. Indeed, before reaching a conclusion on admissibility, the Court must assess the specific scientific and engineering principles applied to the design. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006)

(directing that court "must assess the reasoning and methodology underlying the expert's opinion"). Absent any indication of the designs Wabash is referring to, the Court is unable to conduct the requisite inquiry to determine whether the evidence is relevant and reliable.

In her response, Ms. Hauck construes Wabash's contention as addressing the designs proffered by Dr. Batzer. *See* (Doc. 159) at 7-8 (listing "three reasons" why Wabash's argument to exclude Dr. Batzer's design prototype fails). This Court, however, has already discussed the admissibility of Dr. Batzer's designs at length in its Memorandum Opinion and Order (Doc. 173). The Court ultimately concluded that Dr. Batzer's design prototype is unreliable and, thus, inadmissible before the jury. (Doc. 173).

Therefore, to the extent that Wabash argues Dr. Batzer's design is inadmissible, this claim is properly denied as moot. Moreover, the additional designs that Wabash asserts are unreliable lack specificity and development; thus, this Court cannot conduct a meaningful *Daubert* review. As a result, any "catch-all" inadmissibility Wabash proclaims is likewise properly denied.

### I. Designs that Post-date Trailer's Manufacture

In its Motion, Wabash next argues that the alternative designs Ms. Hauck relies on "post-dated" the trailer's manufacture and, therefore, evidence of the designs cannot be introduced to prove negligence or strict products liability. (Doc. 156) at 11-12. Wabash cites "four possible alternative designs" it claims Ms. Hauck may rely on at trial. *Id.* at 11. These designs include Mr. Ponder's Angel Wing, Dr. Batzer's patented prototype, Wabash's side underride protector, and a protective barrier created by Strict Trailers. *Id.*

This Court has already excluded Mr. Ponder's Angel Wing, Dr. Batzer's design prototype, and Wabash's side underride protector on reliability grounds. *See* (Doc. 173); *see*

*also supra* § *G. Proof of Concept Design*. As a result, Wabash's current contention for exclusion

of these designs on this alternative basis is denied as moot. Furthermore, the remaining fourth

and final design produced by Strict Trailers was created before the subject trailer was

manufactured. *See id.* (arguing that "[o]nly one design (created by Strict Trailers in 2000) pre-

dated the manufacture of the subject trailer"). Thus, Wabash's current objection is inapplicable

to that design. For these reasons, the Court denies Wabash's objection on this point.

>    *J.   Truck Trailer Manufacturers Association Statement*

Next, Wabash seeks to prevent Ms. Hauck from introducing a statement made in 2000 by

the Truck Trailer Manufacturers Association President, Richard Bowling. (Doc. 156) at 14.

Specifically, Wabash requests exclusion of Mr. Bowling's statement printed in a U.S. News and

World Report magazine, exclaiming, "'we could do that,' with regards to side guards in the year

2000." *Id.*; *see also* (Doc. 144-2) at 38 (copy of 2000 U.S. News and World Report article and

Mr. Bowling's quoted statement). Ms. Hauck attempts to introduce this statement through the

testimony of Mr. Ponder, who cited the excerpt in his affidavit. (Doc. 156) at 14; *see also* (Doc.

144-2) at 4 (Mr. Ponder's affidavit quoting the article). In support, Ms. Hauck argues that Mr.

Bowling's statement is admissible under Federal Rule of Evidence 703. (Doc. 159) at 12-13.

Ms. Hauck, therefore, requests that the Court admit the statement and include a jury instruction

on the scope of its applicability. *Id.* at 13-14.

Under Federal Rule of Evidence 703, the proponent of an opinion may present otherwise

inadmissible evidence relied on by an expert, if: (1) experts in the particular field would

reasonably rely on those kinds of facts or data; and (2) the probative value in helping the jury

evaluate the opinion substantially outweighs its prejudicial effect. Under the first factor, a court

should consider whether a professional in the expert's field would consider the information from

among his "numerous sources and [] considerable variety" in proffering his opinion. Fed. R.

Evid. 703, Advisory Comm. Notes. For example, a physician may reasonably base his diagnosis

on "statements by patients and relatives, reports and opinions from nurses, technicians and other

doctors, hospital records, and X rays." *Id.* Similarly, an engineer may reasonably be expected to

"rely on the measurements and opinions of other engineers," in analyzing the pertinent materials

and rendering his final opinion. *Fava v. Liberty Mutual Ins. Corp.*, 2018 WL 4510255, at *5

(D.N.M.) (Johnson, J.). In both these instances, the underlying facts and data relied on by the

experts are admissible under Rule 703.

   Conversely, Rule 703 advises that "statements of bystanders" regarding the "point of

impact in an automobile collision" would not satisfy this "reasonable reliance" requirement.

Fed. R. Evid. 703, Advisory Comm. Notes 1972 Amends. Likewise, the Tenth Circuit opined

that a plaintiff's version of events, regarding the scope of care a doctor offered his patient, "was

not the kind of fact upon which experts in the particular field would reasonably rely." *Greig v.*

*Botros*, 525 Fed. Appx. 781, 791 (10th Cir. 2013) (explaining that doctor could be expected to

rely on "medical records, as opposed to [p]laintiff's 'understanding'"). In *Grieg*, therefore, the

Tenth Circuit affirmed the lower court's holding that a "[p]laintiff should not be permitted to

circumvent the Federal Rules of Evidence by presenting otherwise inadmissible evidence

through … an expert witness." *Id.*

   Here, under the first factor, the Court does not accept that mechanical engineers

ordinarily rely on 2000 U.S. News and World Report excerpts to proffer a professional opinion.

Indeed, after combing hundreds of pages of scholarly literature supplied by the parties, and the

sources cited in the experts' reports, the only references to magazine and newspaper articles

appear in Plaintiff's expert reports, authored by Mr. Ponder and Dr. Batzer. *See e.g.*, (Doc. 136-

3) at 6 (citing 1999 PBS and 2017 Today Show segments); (Doc. 136-5) at 6, 8 (citing 2015 Detroit News and 2000 WebMD articles); (Doc. 136-7) at 2 (citing 2017 NBC News article). The magazine article at issue is more akin to the statements of bystanders and plaintiff's testimonial rejected by the Federal Rules, rather than the medical and engineering opinions that were accepted under the same framework.  Simply put, the Court is not persuaded that mechanical engineers generally rely on magazine articles in proffering their professional opinions.

Even assuming *arguendo* that the first factor of Rule 703 is satisfied, however, Ms. Hauck has not satisfied the second.  Indeed, Wabash has alleged colorable claims of unfair prejudice if Mr. Bowling's statement is admitted for review by the jury.  *See* (Doc. 164) at 9. Namely, the statement is now 21 years old, is proffered by an individual that is neither a party nor otherwise involved in this case, and it lacks any independent or objective assurance of its veracity.  Taken together, these facts demonstrate the potential unreliability of the statement and the inability of Wabash to elicit further information from Mr. Bowling on the statement's context or intended purpose.  Ms. Hauck has not demonstrated that any probative value gained from admitting the statement substantially outweighs this prejudice.

The U.S. News and World Report article quoting Mr. Bowling is inadmissible under Rule 703.  This conclusion is consistent with Rule 703, which imposes "a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose[.]"  Fed. R. Evid. 703, Advisory Comm. Notes 2000 Amends. Wabash's objection on this point, therefore, is sustained.

### K.  Accident Reconstruction Testimony

Wabash next requests that this Court prohibit Ms. Hauck from attacking the methodology and calculations of its expert, Mr. Irwin.  (Doc. 156) at 16.  In support, Wabash explains that, because Ms. Hauck failed to preserve the PT Cruiser, she should be prohibited from attacking Mr. Irwin's opinion based on his inability to personally examine the vehicle.  *Id.*  Moreover, Wabash claims that as an additional sanction for her spoliation of evidence, Ms. Hauck should be prohibited from offering the opinion of her accident reconstructionist, Dennis O'Brien.  *Id.* at 17. Ms. Hauck opposes Wabash's request for punitive sanctions.  (Doc. 159) at 14-15.

In its February 3, 2020, Memorandum Opinion and Order (Doc. 122) analyzing Wabash's Motion to Dismiss for Spoliation (Doc. 34), this Court extensively reviewed Ms. Hauck's loss of the PT Cruiser.  First, the Court concluded that Ms. Hauck "breached her duty to preserve the PT Cruiser."  (Doc. 122) at 13.  Second, the Court analyzed whether Ms. Hauck's breach prejudiced Wabash in its defense of this case.  *Id.*

In its accompanying analysis, the Court explained that "if either the plaintiff, the plaintiff's agents, or the plaintiff's expert viewed the spoliation evidence prior to its spoliation, prejudice to the defendant occurs if the photographic/documentary evidence related to the spoliated evidence fails to capture the relevant characteristics of the spoliated evidence so that a defendant's expert relying on that photographic/documentary evidence can only render a speculative opinion."  (Doc. 122) at 19 (citing *inter alia*, *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007); *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, 1998 WL 68879 (10th Cir.)).  Ultimately, the Court concluded that Wabash "ha[d] not carried its burden [in] demonstrating that the spoliation of the PT Cruiser actually prejudices

[its] ability to defend this case." *Id.* at 21. As a result, the Court denied Wabash's Motion to Dismiss for Spoliation (Doc. 34). *Id.*

The Court reiterates that Ms. Hauck breached her duty to preserve the PT Cruiser for Wabash's inspection. *See id.* at 13. However, any sanction imposed for a plaintiff's spoliation of evidence must be proportionate to the prejudice suffered by "the adverse party [from] the destruction of the evidence." *Id.* at 11-12 (citing *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009)); *see also Mariposa Farms, LLC v. Westfalia-Surge, Inc.*, 2005 WL 8164175, at *2 (D.N.M.) (explaining that "[i]n determining the sanction to be imposed for spoliation, there are three factors to consider: (1) the degree of fault of the party who … destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party yet serve to deter such conduct by others in the future") (internal citations omitted). The Court has determined that Wabash did not suffer serious prejudice and, thus, the imposition of severe remedial or punitive sanctions is not appropriate. (Doc. 122) at 21.

As a result, the Court rejects Wabash's request to exclude Mr. O'Brien from testifying. This is a severe penalty that is not proportionate to the prejudice Wabash suffered. However, the Court agrees with Wabash's alternative sanction, that Ms. Hauck should be precluded "from attacking [Mr.] Irwin's calculation as speculative as a result of evidence that is missing because of her own spoliation." *See* (Doc. 164) at 11. For example, Ms. Hauck cannot attempt to lead the jury to accept a negative inference because Mr. Irwin did not examine the vehicle. Instead, because Ms. Hauck's failure to preserve the vehicle inhibited Mr. Irwin's examination, his opinion shall not be attacked on this basis. *See Mariposa Farms, LLC.*, 2005 WL 8164175, at

*2-3 (explaining that sanction should be proportionate to prejudice suffered and seek to "level the playing field" between parties).

In addition, Wabash may elicit testimony from Mr. Irwin that he was unable to examine the vehicle because it was destroyed after Mr. O'Brien conducted his review. This information ensures that if jurors are inclined to afford Mr. Irwin's opinion less weight, or otherwise attach a negative inference to the fact that he did not personally examine the vehicle, they understand that such an option was not available to him. *See U.S. Commodity Futures Trading Comm. v. Gramalegui*, 2017 WL 2570022, at *4 (D. Colo.) (explaining that "sanction to be applied needs to be one which is appropriate to the truth-finding process") (internal citation omitted).

Wabash's request for sanctions is granted in part and denied in part. Specifically, Ms. Hauck may not impeach or cross-examine Mr. Irwin on the weaknesses associated with his report because of his inability to personally examine the accident vehicle. In addition, the Court will allow Wabash to elicit testimony from Mr. Irwin on why he was unable to examine the PT Cruiser, to negate any possible prejudice that could arise from this missing evidence. In all other respects, Wabash's request is denied.

### L.   *"Wall of Light" Testimony*

Wabash next requests that the Court exclude Mr. O'Brien's testimony regarding the "wall of light" that obstructed Ms. Chambers' vision preceding the accident. (Doc. 156) at 17. Wabash makes two arguments in support of this claim. *Id.* at 17-19. First, Wabash contends that Mr. O'Brien's testimony does not "qualify as proper expert opinion testimony" because any juror who has "driven in the dark" could reach the conclusions that he offers. *Id.* at 18-19. Second, Wabash alleges that Mr. O'Brien's testimony is unreliable. *Id.* at 17-18.

Mr. O'Brien, a certified forensic crash specialist, submitted three reports in support of his findings, the first of which was authored on November 7, 2018.  (Doc. 156-8) at 3.  In his initial report, Mr. O'Brien opined that "[Ms.] Chambers was traveling at a max speed of approximately 40 mph in a posted 55 mph zone at the start of the pre-impact skid marks … [and] [t]his speed … could indicate that [Ms.] Chambers slowed her vehicle down … as she approached the stationary or slow moving [trailer] that was in the approaching lane of travel with its headlights illuminated directly at her."  *Id.* at 6.  Moreover, Mr. O'Brien explained that "there could have been a diminished amount of light from the [vehicle's] headlights that was reflected back to Ms. Chambers as she traveled toward the impact through the wall of light…."  *Id.*

On the following page, Mr. O'Brien explained the impact angle of Ms. Chambers' vehicle and the trailer, the braking and impact speeds at the time of the collision, the delta-v force, and the skid-mark distance across the roadway.  *Id.* at 7.  These findings are beyond the scope of what a lay juror could deduce in the absence of expert testimony.  *See, e.g.*, *id.* at 7 (explaining that Ms. Chambers "initiated emergency braking from approximately 40 mph and skidded to an impact speed of approximately 27 mph in under 1 second (0.82 seconds), and experienced a delta-v of approximately 27 mph"); *id.* (explaining trailer angle of 40 degrees and impact angle of 320 degrees).  As a forensic accident reconstructionist, Mr. O'Brien's testimony is helpful in illustrating the accident and the accompanying circumstances for the jury.  *See* Fed. R. Evid. 702(a) (explaining expert witness should possess "specialized knowledge" to "help the trier of fact [] understand the evidence").  Therefore, Wabash's objection on this point is denied.

In addition, Mr. O'Brien's report is supported by reliable citations and evidence.  *See* (Doc. 156-8) at 5-7.  Particularly, Mr. O'Brien cites Institute of Police Technology and Management reports, diagrams he constructed of the accident circumstances, analyses of the

"speed of the vehicle" and the "speed lost by the vehicle," forensic engineering articles, "the angle between the light beam and the perpendicular face of the reflective surface," the overlay of the angles and the vehicle's damage, the "impact speed" of the vehicle as determined "according to the methodology" established in research studies, and a "Forensic Aspects of Driver Perception and Response" article. *Id.* Wabash does not contend that any of these underlying methodologies or reports are unreliable or erroneously drafted. As a result, the Court likewise denies Wabash's request to exclude Mr. O'Brien's report as unreliable pursuant to *Daubert* and its progeny. The entirety of Wabash's objection on this point, therefore, is denied.

### M. Government Accountability Office Report

Next, Wabash requests the Court enter a preliminary ruling admitting a Government Accountability Office Report into evidence, under Rules 803(8). (Doc. 156) at 19-20. In response, Ms. Hauck asserts that Wabash failed to disclose the Report pursuant to its duty to disclose under Rule 26. *Id.* at 19. Instead, Ms. Hauck asserts that Wabash first disclosed the Report during Mr. Ponder's deposition. *Id.* Moreover, Ms. Hauck claims, the Report is inadmissible hearsay. *Id.* For these reasons, Ms. Hauck objects to admission of the Report. *Id.*

In combatting Ms. Hauck's contention, Wabash asserts that it was not required to disclose the Report during the exchange of Rule 26 discovery because it intends to utilize the Report as impeachment evidence. (Doc. 164) at 12. As this Court previously explained, a party may introduce evidence for the first time during a deposition, so long as its use is limited to impeachment purposes at trial. *See* Fed. R. Civ. Pro. 26(a)(1)(A)(ii) (explaining disclosure requirements for impeachment evidence). Accordingly, just as Ms. Hauck may utilize the lobbying reports disclosed during Mr. Ponder's deposition, so too can Wabash introduce this

22

evidence for purposes of impeachment at trial. *See id.* Any purpose beyond impeachment, however, is inadmissible because the Report was not otherwise disclosed.

Next, in anticipation of Ms. Hauck's objection at trial, Wabash requests that the Court issue a ruling that the Report is admissible under a Rule 803 hearsay exception. (Doc. 156) at 19. Pursuant to Rule 803(8), a "record or statement of a public office" is excluded by the rule against hearsay if "(A) it sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report ... or; (iii) factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."

Two of these requirements are readily satisfied. First, the Report is authored by the United States Government Accountability Office, thus satisfying the requirement that it be drafted by a "public office." (Doc. 156-10) at 2. Second, Ms. Hauck does not attempt to argue that the Report "show[s] that the source of information or other circumstances indicate a lack of trustworthiness," and the Court finds no indication to believe the report lacks candor. Therefore, the only inquiry remaining for the Report's admission under Rule 803(8) pertains to its contents.

In pertinent part, the Report explains that it was drafted for "congressional requestors," specifically, Senators Marco Rubio and Kristen Gillibrand, among others, to "review data on truck underride crashes and information on underride guards." *Id.* at 3. The Report then sets forth its factual findings, its examination of underride crash fatalities, current underride guards on the market, and its conclusions. *Id.* at 4-32. The Report also offers recommendations to the Senators on moving forward with drafting legislation or taking congressional action. *Id.* at 33. From this review, the Court is satisfied that the Report diligently sets forth "factual findings from a legally authorized investigation" in compliance with Rule 803(8).

Accordingly, the Court concludes that the Report is admissible as a hearsay exception under Rule 803(8).  Furthermore, Wabash may only introduce the Report for purposes of impeachment, because it was not otherwise disclosed during discovery.  This requirement notwithstanding, the Court grants Wabash's request for admission of the Report under Rule 803(8).

*III.    Conclusion*

In conclusion, the Court grants in part and denies in part Wabash's Motion in Limine (Doc. 156).  Specifically, the Court:

(1) denies as moot Wabash's request to exclude evidence of Mr. Ponder's Angel Wing design, Ivy Chambers' damages, and designs that "post-date" the manufacture of the trailer;

(2)  grants without objection Wabash's request to exclude evidence of the "cost-benefit analysis" to measure Ms. Chambers' life;

(3)  grants Wabash's request to exclude the U.S. News and World Report magazine excerpt, and its request to admit the Government Accountability Office report;

(4)  denies Wabash's request to exclude evidence of its wealth, other unconstructed designs, and Mr. O'Brien's "wall of light" testimony; and

(5)  grants in part and denies in part Wabash's request to exclude evidence of its lobbying efforts, dissimilar crash testing, proof of concept design, and accident reconstruction evidence.

The Court concludes that the evidence of lobbying Mr. Ponder first disclosed during his deposition is only admissible for purposes of impeachment.  The remaining evidence of Wabash's lobbying efforts, however, is admissible.  Moreover, Ms. Hauck cannot utilize the crash testing identified in Mr. Lewis' report as reconstruction evidence.  Instead, because of its

24

dissimilarity, this evidence is limited to use as an illustration. In addition, Wabash's proof of concept design is unreliable under *Daubert*. This evidence, therefore, may not be introduced as a feasible alternative design. Lastly, Ms. Hauck may not elicit testimony to discredit Mr. Irwin's report because of his inability to inspect the accident vehicle. Conversely, Wabash may admit evidence that the vehicle was destroyed after Mr. O'Brien inspected it, thus, stripping Mr. Irwin of the opportunity for personal review.

IT IS ORDERED.


UNITED STATES DISTRICT JUDGE